UNITED STATES of America and John C. Coppola, Special Agent Internal Revenue Service, Plaintiffs-Appellants,

v.

MANUFACTURERS AND TRADERS TRUST COMPANY, Defendant,

Robert Jane and Wilhemina Jane, Intervenors-Appellees.

No. 684, Docket 82–6220.

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1983.

Decided March 18, 1983.

William A. Whitledge, Atty., Tax Division, Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, and Charles E. Brookhart, Attys., Tax Division, Washington, D.C., and Salvatore R. Martoche, U.S. Atty., W.D. N.Y., Buffalo, N.Y., of counsel), for plaintiffs-appellants.

Joseph M. LaTona, Buffalo, N.Y. (Condon, LaTona & Klingensmith, P.C., Buffalo, N.Y., of counsel), for intervenors-appellees.

Before FEINBERG, Chief Judge, and CARDAMONE and DAVIS,* Circuit Judges.

OSCAR H. DAVIS, Circuit Judge:

The refusal of the Western District of New York (Elfvin, J.) to enforce summonses issued by the Internal Revenue Service (IRS) at the request of and in aid of Canada raises questions under the United States-Canada Tax Convention of 1942. The prime problem is whether the IRS can obtain information needed by Canada to help determine a Canadian taxpayer's liability to it but also intended to be used by criminal investigators and prosecutors in Canada. We hold that all the requirements of the Convention have been satisfied and the summonses should have been enforced.

\* Honorable Oscar H. Davis of the United States Court of Appeals for the Federal Circuit, sitting by designation.

I

The United States-Canada Tax Convention of 1942, 56 Stat. 1399, provides in Article XIX:

With a view to the prevention of fiscal evasion, each of the contracting States undertakes to furnish to the other contracting State, as provided in the succeeding Articles of this Convention, the information which its competent authorities have at their disposal or are in a position to obtain under its revenue laws insofar as such information may be of use to the authorities of the other contracting State in the assessment of taxes to which this convention relates.

The information to be furnished under the first paragraph of this Article, whether in the ordinary course or on request may be exchanged directly between the competent authorities of the two contracting States.

Article XXI then goes on to declare:

1. If the Minister in charge of the Canadian Department of National Revenue in the determination of the income tax liability of any person under any revenue laws of Canada deems it necessary to secure the cooperation of the Commissioner of Internal Revenue, the Commissioner may, upon request, furnish the Minister such information bearing upon the matter as the Commissioner is entitled to obtain under the revenue laws of the United States of America.

The "revenue laws of the United States of America" (*see* Article XXI, *supra*) under which the Commissioner normally obtains domestic civil tax information encompass the authority to summons persons, such as banks, in possession of "books of account containing entries relating to the business of the person liable for tax" to appear and produce such books and records (26 U.S.C. § 7602). If the summoned person refuses or fails to comply, the district courts have jurisdiction to enforce the summons. 26 U.S.C. §§ 7402(e); 7604. Summonses of

that type were duly issued, at the request of the Canadian government, to the Manufacturers and Traders Trust Company of Buffalo to obtain bank statements, ledger cards and other documents reflecting (or related to) transactions of appellee Robert Jane—all sought in connection with Jane's Canadian tax liability. The bank failed to appear or produce the materials, and this action was commenced in the lower court by the United States and the IRS to enforce the summonses. The Janes sought leave, and were granted the right, to intervene and they have defended the suit.[1]

█ It is established, at least in this circuit, that the Tax Convention contemplates use of the statutory summons and summons-enforcement procedure even though no United States taxes are involved, and the United States is acting solely at the request of the Canadian tax authorities, and for the latter's own purposes. *United States v. A.L. Burbank & Co., Ltd.,* 525 F.2d 9 (2nd Cir.1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). But we have not as yet decided what standards govern such a Canadian request with no overtones for United States tax liability. The district court applied all the rules the Supreme Court has laid down for the enforcement of a summons for the purposes of domestic tax liability, and on that basis ruled the demands not to be enforceable. In particular, the court held the summonses vitiated by the fact that the Canadian tax authorities requesting the information intended to share the produced material with other Canadian officials interested in a pending criminal prosecution against Robert Jane.

It is unnecessary to detail the course of the proceedings in the district court, or the successive stages by which that tribunal reached its ultimate decision that the summonses should not be enforced. A summary of its final position will suffice. After an evidentiary hearing, the district court found these facts which are now undisput-

ed: The intervenors, Robert Jane and his wife Wilhemina, were until 1978 residents of Canada (and at least he was a Canadian citizen). The Canadian Department of National Revenue (CDNR) was investigating their Canadian income tax liabilities for 1976–1978. In the course of that inquiry, the Canadian authorities made a jeopardy assessment against Robert Jane on the theory that he was transferring assets out of Canada. Jane then commenced bankruptcy proceedings in that country. The Royal Canadian Mounted Police (RCMP), charged with investigating criminal matters concerned with bankruptcy, shortly became involved. There was a continuing, close, working relationship between the officials of CDNR, responsible for inquiring into the Jane's tax liability, and the RCMP, responsible for criminal aspects of Robert Jane's bankruptcy. The CDNR's working papers were turned over to the RCMP, and the agent personally working on the civil tax case was ordered to respond to the RCMP agent's questions. Moreover, the district court found, there existed between CDNR and RCMP "an express or implied agreement that, if the CDNR obtained enforcement of the instant summons, the information procured would be made available to the RCMP for its criminal investigating purposes." The court concluded "as a fact, that the material seized by the CDNR [through the summonses before us] were and are sought at least in important part for the use of the RCMP".

As we have said, the court then applied the criteria established by the Supreme Court and this court for the enforcement of an Internal Revenue Service summons in wholly domestic cases—including the requirements barring the Service from seeking information for the very purpose of criminal prosecution or inquiry into that subject—and ordered that enforcement must be denied here for "bad faith".

## II

It may be that, if this were entirely a domestic case, the summonses could not

1. Manufacturers and Trade Trust Company did not participate in the proceedings on the validi-

ty of the summonses or in this court.

properly be enforced in the circumstances found below. The Supreme Court and this court have generally looked askance, in domestic cases, at the intended utilization of an IRS summons to acquire "evidence for use in a [pending] criminal prosecution". *See Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964); *Donaldson v. United States,* 400 U.S. 517, 533, 91 S.Ct. 534, 543, 27 L.Ed.2d 580 (1971); *United States v. LaSalle National Bank,* 437 U.S. 298, 306–08, 98 S.Ct. 2357, 2362–63, 57 L.Ed.2d 221 (1978); *United States v. Chase Manhattan Bank,* 598 F.2d 321 (2nd Cir. 1979); *Matter of Does,* 688 F.2d 144, 148 (2nd Cir.1982). Here, there was certainly an ongoing criminal investigation by the RCMP, and the record indicates that a Canadian warrant for Jane's arrest on criminal charges relating to the concealment of assets is outstanding. Moreover, *LaSalle* warned against the IRS's acting merely as "an information gathering agency" for other governmental units conducting criminal investigations. 437 U.S. at 317, 98 S.Ct. at 2367. In the light of the district court's finding that the materials sought through the summonses are wanted in important part for the use of the RCMP, the total fact-pattern might be sufficient to sustain the ruling below if this were wholly a domestic matter. On the other hand, see *United States v. Chemical Bank,* 593 F.2d 451, 456 (2nd Cir.1979) (summons enforced even though there was considerable interaction between IRS and the Strike Force coordinated by the Department of Justice); *United States v. Scholbe,* 664 F.2d 1163, 1167 (10th Cir.1981) (summons enforced where the IRS had not recommended criminal prosecution although an ongoing criminal non-tax investigation was under way and the IRS had agreed to provide the other agency with information secured via the tax investigation); *United States v. Stuckey,* 646 F.2d 1369, 1376–77 (9th Cir. 1981) (summons enforced where the taxpayer was also under investigation for drug offenses and IRS was willing to share infor-mation with the Drug Enforcement Administration); 26 U.S.C. § 6103(i) (statute authorizing in defined circumstances disclosures by IRS to federal agents administering non-tax laws).

We do not resolve this close problem under our domestic law of summons enforcement because we are not faced with a wholly internal case but, rather, with an international application in which the United States and IRS seek under the Tax Convention to obtain material and information in this country solely for the purposes of the Canadian government. Our position, as we shall spell out, is that, for these international purposes, the requirements for summons-enforcement are not in all respects precisely the same as for domestic cases, and that here the Government has satisfied all the standards applicable under the Convention.

■ The first thing to stress is that, under the Convention (Article XXI, ¶ 1, *supra*), the essential predicate for any request from Canada is always that the Canadian Department of National Revenue (CDNR) be considering "the determination of the income tax liability of [a] person under any revenue laws of Canada". This obviously means civil income tax liability (and is the same as one of the domestic requirements for an enforceable IRS summons in the United States). If that dominant condition is not met, the Convention does not apply at all to the obtaining of information in this country. In this instance that fundamental prerequisite has been found to exist. The most that the district court decided was that CDNR sought the materials "at least in important part for the use of RCMP". This translates into a finding that part of the request was for the CDNR itself in its civil tax-determining capacity.[2] It follows that CDNR has not abandoned the pursuit of civil tax determination or collection.

■ The other major issue is whether there is any prohibition either on obtaining the information partially for the criminal-

2. The section of CDNR concerned with criminal tax prosecution had already declined to con-

sider Jane's case for criminal tax prosecution.

investigatory-prosecutory purposes of the RCMP, or against the interchange of the information between the Canadian officials interested in civil liability and those concerned with criminal prosecution. For this, the agreed premises are that Canadian law does not impose any such prohibition or restriction, and there is no suggestion that general international law can be the source. To find such a directive one must therefore look to United States law. The district court and intervenors-appellees see that requirement in the portion of the Convention (Art. XXI, § 1, *supra*) that empowers the Commissioner to furnish such information "as the Commissioner is entitled to obtain under the revenue laws of the United States of America". Their view is that this phrase simply incorporates all the domestic laws (including the full judicial gloss) governing IRS summonses and their enforcement.[3] This is, of course, a possible reading, but it is not the only tenable one. Another which does not distort the literal language is that, though the Commissioner (if he issues a summons) must proceed under the requirements Congress expressly laid down for a summons in § 7602 (*i.e.,* "the revenue laws of the United States"), the judicial gloss need not be the same for an international case of this type as for a wholly domestic one. The constitutional

and governmental considerations are quite dissimilar. On that view the key words in Article XXI, ¶ 1 emphasize the information the Commissioner "is entitled to obtain"— he can have different "entitlements" under "the revenue laws of the United States" in the two separate kinds of cases.[4]

■ We opt for the latter construction because it fits as well with the Convention's language, accords better with the Supreme Court's reasoning in its decisions restricting use of an IRS summons for criminal prosecution purposes, and fully recognizes the international character of the matters dealt with in the Convention. As we have already suggested, the precise wording of the Convention does not contradict our reading that differentiates between the Commissioner's entitlement to enforce a summons in the international as distinguished from the domestic area. Neither Article XIX nor Article XXI states that the IRS should have exactly the same authority in both areas or that the Commissioner shall have only those powers under the treaty as he has in the wholly domestic sphere. On the contrary, their wording readily permits a difference.[5]

There is good ground for making that difference. The particular aspect of "good faith" (mandated by the Supreme Court for

3.  Except for the express requirement of § 7602 (authorizing an IRS summons) that the information sought be related to a *United States* tax.

4.  Article XIX, *supra,* refers to the information which the requested country's "competent authorities ... are in a position to obtain under its revenue laws". This can surely be read as another way of recognizing and framing the same thought.

5.  In *United States v. A.L. Burbank & Co. Ltd., supra,* 525 F.2d at 13, the court said that under Article XXI "IRS may furnish the *same* information that it would be entitled to obtain under our Revenue Code" (emphasis added) but that statement did not necessarily equate domestic and international cases in all respects; if the Commissioner is entitled under our revenue laws to obtain, in an international case, more material or information than in a domestic suit, the *Burbank* statement would not preclude it. In any event, the *Burbank* court did not have our problem before it and it can hardly be

thought to have resolved it in that one inexplicit sentence.

*Burbank* also quotes (525 F.2d at 17, fn. 7) in another context, a statement by Senator George (during the debate in 1942 on ratification of the Convention): "I do not think there is anything in the convention which would require furnishing information beyond what each Government has the right to ask of its own citizens at the present time." This very general observation—made years before the Supreme Court developed the "good faith" defense—does not indicate that each country's authority to implement the Convention is precisely the same as that government's powers would be if all the components were wholly domestic. More than that, the Senator's observation would seem to authorize the United States to seek information (in this country) pertaining to a Canadian citizen for *Canada's* purposes if Canada could obtain that information in Canada from its own citizens. *See also* fn. 8, *infra.*

the enforcement of the IRS summons)[6] which now concerns us is the Canadian intention to use discovered information and material to aid in a pending criminal prosecution as well as to help determine civil tax liability. We think that the Supreme Court's characterization of that concurrent purpose as a mark of lack of "good faith" stems from special provisions of United States law (i) centering federal criminal prosecutions in this country in the Department of Justice (not the IRS), and (ii) restricting discovery in our criminal cases to certain prosecution rights apart from the IRS summons, as well as in that available through grand jury proceedings. "Nothing in § 7602 or in its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of criminal accusation. [citations omitted] The likelihood that discovery would be broadened or the role of the grand jury infringed is substantial if post-referral [*i.e.,* after an IRS recommendation to prosecute is forwarded to the Department of Justice] use of the summons authority were permitted." *United States v. LaSalle National Bank,* 437 U.S. at 312, 98 S.Ct. at 2365. This policy is wholly internal—related solely to prosecution in this country, to our division of governmental functions, to our continued use of the grand jury in federal criminal matters, and to our position on pre-trial discovery in our criminal cases. That policy is not applicable to Canada which does not have our marked separations and does not normally use the grand jury. Accordingly, there is no purpose to applying it in this case under the Convention. It is hard to believe that, when that Convention authorizes the Commissioner (if he so decides) to obtain for Canada through a summons the information "the Commissioner is entitled to obtain under the revenue laws of the United States,"

the Convention directs that that internal policy must automatically be applied even though it has no present purpose and even though § 7602 does not itself incorporate that policy where Canada is the entity requesting and needing the information for its own objectives. The United States has no interest in thrusting its policy (in this regard) into Canadian prosecutions, Canada has no interest in having that policy applied to its taxpayers, and Robert Jane, as a Canadian taxpayer and accused, has no right to expect that he will have the protection accorded by this country to its own taxpayers and potential defendants. Nor would it be an abuse of our federal courts to omit application of that policy in this external situation.

A related element in determining the meaning of the Convention is that the summons-enforcement here has a decidedly international character, thus invoking considerations special to dealings between separate nations. In Article XIX of the Convention, *supra,* the United States and Canada undertook to furnish each other information "which its competent authorities have at their disposal or are in a position to obtain under its revenue laws insofar as such information may be of use to the authorities of the other contracting State in the assessment of taxes to which this convention relates." This international obligation was triggered in the present case by Canada's declaration that it needs the information in order to determine Jane's Canadian income tax and the district court's acceptance of the truth of that proposition (though Canada's need was joined with an important desire to aid criminal investigation and prosecution in Canada). Since the need was Canada's alone, and use of the information was to be made only there, Canada might consider it a failure on this country's part to comply with the treaty's commitment if enforcement of the summonses were refused on grounds Canada

---

6. *See United States v. LaSalle National Bank,* 437 U.S. 298, 306–319, 98 S.Ct. 2357, 2362–68, 57 L.Ed.2d 221 (1978); *Donaldson v. United States,* 400 U.S. 517, 532–538, 91 S.Ct. 534, 543–46, 27 L.Ed.2d 580 (1971); *United States v.*

*Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964); *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964).

does not recognize in its own territory or with respect to its own income taxes. Canada might wonder what concern the United States has in applying its internal policy to a case in which this country's taxes and citizens are not at all involved—only Canada's. More than that, our international relations with Canada might be damaged and the executives in both countries might be embarrassed if an organ in this country were to characterize a Canadian request as made in "bad faith" where that request was perfectly appropriate under the law of the requesting country.

Congress has given us a lead when it provided in 26 U.S.C. § 7852(d) that no provision of the Internal Revenue Code [adopted in 1954] "shall apply in any case where its application would be contrary to any treaty obligation of the United States in effect on the date of enactment of" the Code.[7] This suggests that, if it is reasonable (as here) to construe a Code provision (such as § 7602) so as not to raise a serious issue of contravention of a pre-existing treaty, that interpretation is to be preferred.

We conclude, on these grounds, that, whatever the result might be if this were entirely a domestic case, it was not "bad faith" for the Canadian tax officials to intend to share the information, obtained through the summonses, with other officials investigating and prosecuting a pending criminal case in Canada.[8]

### III

■ There are other components of "bad faith" which might apply even to this type of international case—e.g., harassment of the taxpayer, putting pressure on him to settle a collateral dispute, or possibly invasion of a recognized privilege (such as the attorney-client privilege). *See United States v. Powell, supra,* 379 U.S. at 57–8, 85 S.Ct. at 254–55; *United States v. LaSalle National Bank, supra,* 437 U.S. at 313–4, 318, 98 S.Ct. at 2365–66, 2368. But there is no showing, and no finding, that elements of that kind exist in this case. The only alleged irregularity mentioned by the court below (aside from the criminal aspect discussed *supra* in Part II) is that the Canadian civil tax agent who supported the petition to enforce the summonses was not the proper person—such support, it is said, should have been supplied by two of her supervisors who were in full charge of the matter. Even if this would be an accurate observation at the outset of the proceeding below, it became irrelevant after an evidentiary hearing was held and the position and relative functions of the Canadian officials became absolutely clear. By the time the district court issued its final decisions there was no doubt (if we are correct in Part II, *supra*) that the petition to enforce was sufficiently supported under § 7602.[9] It would be a useless technicality to insist now that the summonses should not be enforced because the proper Canadian official had not themselves filed affidavits or declarations. *Cf. United States v. Powell, supra,* 379 U.S. at 51–2, 85 S.Ct. at 251–52.

For these reasons the petition for enforcement of the summonses should have been granted.

*Reversed*

---

7. The Canada-United States Convention became effective in 1942. 56 Stat. 1399.

8. We do not, of course, mean our ruling to cover the converse situation where the Internal Revenue Service, having recommended prosecution in this country, seeks help from Canada under the Convention and the Canadian revenue laws. That problem (including the possible suppression in this country of information received from Canada in those circumstances) is not before us.

9. The district court's concern with the absence of declarations or affidavits from the supervising Canadian officials seems to here be entirely entwined with their participation in the collaboration with RCMP—a part of the case we have already held irrelevant (Part II, *supra*).