# UNITED STATES *v.* STUART ET AL.

No. 87–1064.   Argued December 5, 1988—Decided February 28, 1989

354

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in all but Part II–C of which O'CONNOR and KENNEDY, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 370. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 371.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Rose, Alan I. Horowitz, Charles E. Brookhart,* and *John A. Dudeck, Jr.*

*Charles E. Peery* argued the cause for respondents. On the brief was *Brian L. McEachron.*

JUSTICE BRENNAN delivered the opinion of the Court.

Articles XIX and XXI of the Convention between the United States and Canada Respecting Double Taxation, Mar. 4, 1942, 56 Stat. 1405–1406, T. S. No. 983, oblige the United States, upon request and consistent with United States revenue laws, to obtain and convey information to Canadian authorities to assist them in determining a Canadian taxpayer's income tax liability. The question presented is whether the United States Internal Revenue Service may issue an administrative summons pursuant to a request by Canadian au-

thorities only if it first determines that the Canadian tax investigation has not reached a stage analogous to a domestic tax investigation's referral to the Justice Department for criminal prosecution. We hold that neither the 1942 Convention nor domestic legislation imposes this precondition to issuance of an administrative summons. So long as the summons meets statutory requirements and is issued in good faith, as we defined that term in *United States* v. *Powell*, 379 U. S. 48, 57–58 (1964), compliance is required, whether or not the Canadian tax investigation is directed toward criminal prosecution under Canadian law.

## I

Respondents are Canadian citizens and residents who maintained bank accounts with the Northwestern Commercial Bank in Bellingham, Washington. In attempting to ascertain their Canadian income tax liability for 1980, 1981, and 1982, the Canadian Department of National Revenue (Revenue Canada) asked the Internal Revenue Service (IRS) in January 1984 to secure and provide pertinent bank records. Revenue Canada made its requests pursuant to Articles XIX and XXI of the 1942 Convention.[1] The IRS Director of For-

---

[1] Articles XIX and XXI of the Convention between the United States and Canada Respecting Double Taxation, Mar. 4, 1942, 56 Stat. 1405–1406, T. S. No. 983, provide in part:

"ARTICLE XIX

"With a view to the prevention of fiscal evasion, each of the contracting States undertakes to furnish to the other contracting State, as provided in the succeeding Articles of this Convention, the information which its competent authorities have at their disposal or are in a position to obtain under its revenue laws in so far as such information may be of use to the authorities of the other contracting State in the assessment of the taxes to which this Convention relates.

"The information to be furnished under the first paragraph of this Article, whether in the ordinary course or on request, may be exchanged directly between the competent authorities of the two contracting States."

"ARTICLE XXI

"1. If the Minister in the determination of the income tax liability of any person under any of the revenue laws of Canada deems it necessary to se-

eign Operations—the "competent authority" under Article XIX—concluded that Revenue Canada's requests fell within the scope of the Convention and that it would be appropriate for the United States to honor them. App. 27–28. Specifically, he found that "the requested information is not within the possession of the Internal Revenue Service or the Canadian tax authorities; that the requested information may be relevant to a determination of the correct tax liability of [respondents] under Canadian law; and that the same type of information can be obtained by tax authorities under Canadian law." *Id.*, at 28. Thus, on April 2, 1984, the IRS served on Northwestern Commercial Bank administrative summonses for the requested information.

At respondents' behest, the bank refused to comply. In accordance with 26 U. S. C. § 7609(b)(2), respondents petitioned the United States District Court for the Western District of Washington to quash the summonses. Only one of their claims is before us. Respondents contended that because the IRS may not issue a summons to further its investigation of a United States taxpayer when a Justice Department referral is in effect, 26 U. S. C. § 7602(c), and because Revenue Canada's investigation of each of them was, in the words of the IRS Director of Foreign Operations, "a criminal investigation, preliminary stage," App. 28, United States law proscribed the use of a summons to obtain information for Canadian authorities regarding respondents' American bank accounts. The Magistrate who held a consolidated hearing on respondents' claims rejected this argument. Without addressing their contention that the IRS may not issue a summons pursuant to a request by Revenue Canada once a Canadian tax investigation has reached a stage equivalent to a Justice Department referral for criminal prosecution, the

cure the cooperation of the Commissioner, the Commissioner may, upon request, furnish the Minister such information bearing upon the matter as the Commissioner is entitled to obtain under the revenue laws of the United States of America."

Magistrate found that, even if respondents' legal claims were assumed to have merit, they had failed to carry their burden of showing that the Canadian authorities' investigation had advanced that far. App. to Pet. for Cert. 31a. Upon considering the Magistrate's report and respondents' objections to it, the District Court ordered the bank to comply with the summonses. *Id.*, at 25a–26a, 34a–35a.

After the Court of Appeals for the Ninth Circuit stayed the enforcement orders pending appeal, a divided panel of the court reversed. 813 F. 2d 243 (1987). The Ninth Circuit held that a summons issued pursuant to a request under the 1942 Convention, like one issued as part of a domestic tax investigation, will be enforced only if it was issued in good faith. The Court of Appeals further stated that the elements of good faith we described in *United States* v. *Powell, supra,* at 57–58, are not exhaustive; rather, in light of our subsequent decision in *United States* v. *LaSalle National Bank,* 437 U. S. 298 (1978), and Congress' enactment of what is now 26 U. S. C. § 7602(c), good faith in domestic tax investigations also requires that the IRS not have referred the case to the Justice Department for possible criminal prosecution. Finally, and most significantly for purposes of this litigation, the Ninth Circuit ruled that the IRS acts in good faith in complying with a request for information under the 1942 Convention only when Canadian authorities act in good faith in seeking IRS assistance, and that the good faith of Canadian authorities should be judged by the same standard applicable to the IRS when it conducts a domestic investigation. Hence, the Court of Appeals concluded, before the IRS may honor a request for information it must determine that Revenue Canada's investigation has not reached a stage analogous to a Justice Department referral by the IRS. In addition, the Court of Appeals said, "in order to establish its prima facie case by affidavit, the IRS must make an affirmative statement" that Canadian authorities are acting in good

faith and that their investigation has not yet reached that stage; the burden of proof on this point rests initially with the IRS rather than the taxpayer attempting to quash a summons, the court held, because the IRS "can consult with Canada's competent authority and can be expected to have greater familiarity with Canadian administrative procedures." 813 F. 2d, at 250. The Court of Appeals reversed the District Court's decision because the affidavits submitted by the IRS failed to state that Revenue Canada's investigation of respondents had not yet reached a point analogous to an IRS referral to the Justice Department.

We granted certiorari, 485 U. S. 1033 (1988), to resolve a conflict between the Ninth Circuit's decision in this case and the Second Circuit's holding in *United States* v. *Manufacturers & Traders Trust Co.*, 703 F. 2d 47 (1983). We now reverse.

## II

### A

In *United States* v. *Powell, supra,* we rejected the claim that the IRS must show probable cause to obtain enforcement of an administrative summons issued in connection with a domestic tax investigation. See *id.,* at 52–57. We held instead that the IRS need only demonstrate good faith in issuing the summons, which we defined as follows:

> "[The IRS Commissioner] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed—in particular, that the 'Secretary or his delegate,' after investigation, has determined the further examination to be necessary and has notified the taxpayer in writing to that effect."
> *Id.,* at 57–58.

Once the IRS has made such a showing, we stated, it is entitled to an enforcement order unless the taxpayer can show that the IRS is attempting to abuse the court's process. "Such an abuse would take place," we said, "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.*, at 58. See also *United States* v. *Bisceglia*, 420 U. S. 141, 146 (1975). The taxpayer carries the burden of proving an abuse of the court's process. 379 U. S., at 58.

Leaving aside the question whether the 1942 Convention, in conjunction with 26 U. S. C. § 7602(c), narrows the class of legitimate purposes for which the IRS may issue an administrative summons, the affidavits the IRS submitted in respondents' cases plainly satisfied the requirements of good faith we set forth in *Powell* and have repeatedly reaffirmed. See, *e. g.*, *Tiffany Fine Arts, Inc.* v. *United States*, 469 U. S. 310, 321 (1985); *United States* v. *Arthur Young & Co.*, 465 U. S. 805, 813, n. 10 (1984). The IRS Director of Foreign Operations stated under oath that the information sought was not within the possession of American or Canadian tax authorities, that it might be relevant to the computation of respondents' Canadian tax liabilities, and that the same type of information could be obtained by Canadian authorities under Canadian law. App. 28. He further noted that the "[e]xchanged information may only be disclosed as required in the normal administrative or judicial process operative in the administration of the tax system of the requesting country," and that improper use of exchanged information would be protested. *Ibid.* In addition, the IRS issued its summonses in conformity with applicable statutes and duly informed respondents of their issuance. In their petitions to quash, respondents nowhere alleged that the IRS was trying to use the District Court's process for some improper purpose, such as harassment or the acquisition of

bargaining power in connection with some collateral dispute. See *id.*, at 18–20. Nor does it appear that they later sought to prove abuse of process. Unless 26 U. S. C. § 7602(c) or the 1942 Convention imposes more stringent requirements on the enforcement of the administrative summonses issued in this case, the IRS was entitled to enforcement orders under the rule laid down in *Powell.*

## B

Section 7602(c) does impose an additional constraint on the issuance of summonses to further domestic tax investigations.[2] By its terms, however, it does not apply to the sum-

---

[2] Section 7602(c) of Title 26 reads:

"(c) No administrative summons when there is Justice Department referral

"(1) Limitation of authority

"No summons may be issued under this title, and the Secretary may not begin any action under section 7604 to enforce any summons, with respect to any person if a Justice Department referral is in effect with respect to such person.

"(2) Justice Department referral in effect

"For purposes of this subsection—

"(A) In general

"A Justice Department referral is in effect with respect to any person if—

"(i) the Secretary has recommended to the Attorney General a grand jury investigation of, or the criminal prosecution of, such person for any offense connected with the administration or enforcement of the internal revenue laws, or

"(ii) any request is made under section 6103(h)(3)(B) for the disclosure of any return or return information (within the meaning of section 6103(b)) relating to such person.

"(B) Termination

"A Justice Department referral shall cease to be in effect with respect to a person when—

"(i) the Attorney General notifies the Secretary, in writing, that—

"(I) he will not prosecute such person for any offense connected with the administration or enforcement of the internal revenue laws,

monses challenged by respondents, for it speaks only to investigations into possible violations of United States revenue laws. Section 7602(c) forbids the issuance of a summons "if a Justice Department referral is in effect" with respect to a person about whom information is sought by means of the summons. At the time of the District Court's decision, no Justice Department referral was in effect with regard to respondents; indeed, the IRS agent seeking the bank records to fulfill Revenue Canada's request said in her affidavit that no domestic tax investigation of any kind was pending. See App. 30. Section 7602(c) therefore does not itself appear to bar enforcement of the summonses at issue here.[3]

The legislative history of § 7602(c) supports this conclusion. Prior to its enactment, we held in *United States* v. *LaSalle National Bank*, 437 U. S. 298 (1978), that the IRS may not issue a summons once it has recommended prosecution to the Justice Department, nor may it circumvent this requirement

"(II) he will not authorize a grand jury investigation of such person with respect to such an offense, or

"(III) he will discontinue such a grand jury investigation.

"(ii) a final disposition has been made of any criminal proceeding pertaining to the enforcement of the internal revenue laws which was instituted by the Attorney General against such person, or

"(iii) the Attorney General notifies the Secretary, in writing, that he will not prosecute such person for any offense connected with the administration or enforcement of the internal revenue laws relating to the request described in subparagraph (A)(ii).

"(3) Taxable years, etc., treated separately

"For purposes of this subsection, each taxable period (or, if there is no taxable period, each taxable event) and each tax imposed by a separate chapter of this title shall be treated separately."

[3] We need not, and do not, decide whether the IRS could issue a summons to honor a treaty request if the individual under investigation by the requesting foreign government were also under investigation by American authorities and a Justice Department referral were in effect with respect to him. Nor do we address the question whether the IRS could use in a criminal prosecution evidence it obtained from Canadian authorities pursuant to a treaty request made while a Justice Department referral was in effect.

by delaying such a recommendation in order to gather additional information. We based our holding in large part on our finding that "[n]othing in § 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of criminal accusation." *Id.*, at 312 (citations omitted). When Congress codified the essence of our holding in § 7602(c), it apparently shared our concern about permitting the IRS to encroach upon the rights of potential criminal defendants. The Report of the Senate Finance Committee noted that "the provision is in no way intended to broaden the Justice Department's right of criminal discovery or to infringe on the role of the grand jury as a principal tool of criminal prosecution." S. Rep. No. 97–494, Vol. 1, p. 286 (1982).

This explanation for the restriction embodied in § 7602(c) suggests that Congress did not intend to make the enforcement of a treaty summons contingent upon the foreign tax investigation's not having reached a stage analogous to a Justice Department referral. None of the civil-law countries with whom the United States has tax treaties providing for exchanges of information employ grand juries, and Canada has ceased to use them.[4] Moreover, criminal discovery procedures differ considerably among countries with whom we have such treaties.[5] The concerns that prompted Congress

[4] See the Criminal Law Amendment Act, 1985, ch. 19, §§ 113–115, reprinted in Revised Statutes of Canada, ch. 27, §§ 113–115 (Supp. I 1985). See also *McKibbon* v. *Queen*, [1984] 1 S. C. R. 131, 137–157, 6 D. L. R. 4th 1, 20–35 (1984) (recounting the history of grand juries in Canada). Other common-law countries have eliminated the grand jury as well. See, *e. g.*, *Saywell* v. *Attorney-General*, [1982] 2 N. Z. L. R. 97, 100–105 (H. C.) (discussing consequences for presentation of indictment of abolition of grand juries in New Zealand, England, and Australia).

[5] As of September 30, 1988, the United States had in force income tax conventions containing exchange of information provisions with over 30 countries, ranging from France to Poland to Japan. Fogarasi, Gordon,

to pass § 7602(c) are therefore not present when the IRS issues summonses at the request of most foreign governments conducting investigations into possible violations of their own tax laws. If Congress had intended § 7602(c) to impose a restriction on the issuance of summonses pursuant to treaty requests parallel to the restriction it expressly imposes on summonses issued by the IRS in connection with domestic tax investigations, it would presumably have offered some reason for extending the sweep of the section beyond its plain language. In addition, Congress would likely have discussed the appropriateness of extending the protections afforded by United States law to citizens of other countries who are not subject to criminal prosecution here, and would doubtless have considered the problems posed by the application of § 7602(c) to requests by treaty partners, in particular the difficulty of determining when a foreign investigation has progressed to a point analogous to a Justice Department referral.[6] Respondents have not directed us, however, to any-

---

Venuti, & Renfroe, Current Status of U. S. Tax Treaties, 17 Tax Mgmt. Int'l J. 507, 509 (1988). Not all of those countries distinguish between civil and criminal prosecutions for tax offenses as does the United States. In some Swiss Cantons, for example, tax fraud—the most severe offense—is prosecuted in the administrative rather than in the criminal courts, and a single administrative agency investigates and prosecutes all tax offenses. See Meier, Banking Secrecy in Swiss and International Taxation, 7 Int'l Law. 16, 26 (1973).

[6] The difficulty of finding the equivalent of a Justice Department referral is particularly acute in Canadian tax investigations. Although criminal prosecution is centered in Canadian attorneys-general, just as criminal prosecution in the United States falls within the province of the Justice Department, "[t]he similarity appears to stop there." Scheim & Cantillon Ross, Stuart v. United States: Standards for Section 7602 Summons in Treaty Matters, 17 Tax Mgmt. Int'l J. 479, 482 (1988). Revenue Canada routinely gathers virtually all of the information necessary for criminal prosecution before turning a case over to the Canadian Justice Department, see id., at 482–484, and available Canadian agency manuals suggest "that a case is referred to Justice only when it is already in a stage amenable to Court presentation, and that some degree of cooperation continues after that point." Id., at 482. Scheim and Cantillon Ross conclude: "It

thing in the legislative history of § 7602(c) suggesting that Congress intended it to apply to summonses issued pursuant to treaty requests, or to any reference to the problems its application would have occasioned. We therefore see no reason to think that § 7602(c) means more than it says.

## C

The only conceivable foundation for the Ninth Circuit's rule that an IRS summons issued at the request of Canadian authorities may not be enforced unless the IRS provides assurance that the Canadian investigation has not proceeded to a stage analogous to a Justice Department referral is therefore the language of the 1942 Convention itself. Article XIX obliges the competent authority for the United States to furnish, upon request, relevant information that it is "in a position to obtain under its revenue laws." Article XXI repeats this clause almost verbatim, permitting the IRS Commissioner to supply Canadian authorities with relevant information he "is entitled to obtain under the revenue laws of the United States of America." Respondents contend that because the IRS would not be able, under American law, to issue an administrative summons to gather information for use by the Government once a Justice Department referral was in effect, the IRS is not in a position to obtain such information once Canadian authorities have reached a corresponding stage in their investigation.

## (1)

We are not persuaded by this argument. "The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations

---

appears therefore that [Revenue Canada] adopts an institutional posture tilted towards prosecution well before referral." *Ibid.* If this conclusion is correct, then it might be difficult in at least some cases to determine whether a Canadian tax investigation has reached a point analogous to a Justice Department referral by the IRS.

of its signatories.'" *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 180 (1982), quoting *Maximov* v. *United States*, 373 U. S. 49, 54 (1963). Articles XIX and XXI both refer to information that the IRS may obtain under American law. American law, however, does not contain the restriction respondents claim to find there. Section 7602(c) only limits the issuance of summonses when a Justice Department referral is in effect; it says nothing about decisions by foreign tax officials to investigate possible violations of their countries' tax laws with a view to criminal prosecution outside the United States. The elements of good faith we outlined in *United States* v. *Powell*, 379 U. S. 48 (1964), do not contain such a restriction. Nor does our reasoning in *United States* v. *LaSalle National Bank*, 437 U. S. 298 (1978), favor the result respondents urge, because the provision of information to Canadian authorities could not curtail the rights of potential criminal defendants in this country by undermining American discovery rules or diminishing the role of the grand jury. And respondents have not suggested that some other segment of American law, such as the law of privilege, prevents the IRS from issuing an administrative summons pursuant to a treaty request once a treaty partner has embarked on a tax investigation leading to a foreign criminal prosecution. Articles XIX and XXI of the 1942 Convention on their face therefore lend no support to respondents' position.

(2)

Nontextual sources that often assist us in "giving effect to the intent of the Treaty parties," *Sumitomo, supra,* at 185, such as a treaty's ratification history and its subsequent operation, further fail to sustain respondents' claim. The Senate Committee on Foreign Relations did not hold hearings on the Convention prior to its ratification in 1942, and the Committee Report did not even mention the provisions for exchange of information. See S. Exec. Rep. No. 3, 77th Cong., 2d Sess. (1942), 1 Legislative History of United States Tax Con-

ventions (Committee Print compiled by the Staff of the Joint Committee on Internal Revenue Taxation) 455 (1962) (Leg. Hist.). The sole reference to these provisions during the brief floor debate in the Senate contained no hint that the 1942 Convention was intended to incorporate domestic restrictions on the issuance of summonses by the IRS in connection with American tax investigations, such as the limitation later codified in § 7602(c).[7] The President's message

---

[7] Contrary to JUSTICE SCALIA's suggestion, see *post*, at 377, the Government relied on the preratification Senate debate in its brief, see Brief for United States 29, and n. 11, pointing out that the only reference to intergovernmental exchanges of information came in the following colloquy:

"Mr. TAFT . . .

"In other words, if an American citizen were using a Canadian bank deposit to evade income taxation, I think the convention would permit the United States Government to ask the Canadian Government to obtain information from its own bank and furnish it to this Government in connection with the enforcement of our internal-revenue laws.

"Mr. GEORGE. It does provide for exchange of information, as the Senator from Ohio points out." 88 Cong. Rec. 4714 (1942).

Nor is reliance on the Senate's preratification debates and reports improper. As JUSTICE SCALIA acknowledges, the American Law Institute's most recent Restatement counsels consideration of such materials. See Restatement (Third) of Foreign Relations Law of the United States § 314, Comment *d* (1987) ("indication that . . . the Senate ascribed a particular meaning to the treaty is relevant"); *id.*, § 325, Reporters' Note 5 ("A court . . . is required to take into account . . . (i) Committee reports, debates, and other indications of meaning that the legislative branch has attached to an agreement . . . "). Consultation of these materials is eminently reasonable. *Pace* JUSTICE SCALIA, reviewing preratification Senate debates and reports is not akin to "determining the meaning of a bilateral contract between two corporations on the basis of what the board of directors of one of them thought it meant when authorizing the chief executive officer to conclude it." *Post*, at 374. Senate debates do not occur behind closed doors, out of earshot of proposed treaty partners, nor are preratification Senate reports kept under seal. Both are public statements. They therefore bear no resemblance to the private deliberations of a board of directors prior to the board's decision whether to authorize the chief executive officer to sign an agreement. Insofar as the contract analogy is apt, the better comparison is to a meeting of the board whose minutes and position pa-

accompanying transmittal of the proposed treaty to the Senate, see S. Exec. Doc. B, 77th Cong., 2d Sess. (1942), reprinted in Leg. Hist. 445, and the President's Proclamation at the time the Convention was signed, see Leg. Hist. 475, 56 Stat. 1399, similarly contain no language supporting respondents' argument. Indeed, given that a treaty should generally be "construe[d] . . . liberally to give effect to the purpose which animates it" and that "[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred," *Bacardi Corp. of America* v. *Domenech,* 311 U. S. 150, 163 (1940) (citations omitted), the evident purpose behind Articles XIX and XXI—the reduction of tax evasion by allowing signatories to demand information from each other—counsels against interpreting those provisions to limit inquiry in the manner respondents desire. In any event, nothing in the history of the Convention's ratification buttresses respondents' claim.[8]

---

pers the other corporation's board and chief executive officer are invited to peruse. It is hornbook contract law that the proper construction of an agreement is that given by one of the parties when "that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." Restatement (Second) of Contracts § 201(2)(b) (1981). See also E. Farnsworth, Contracts 487–488 (1982). A treaty's negotiating history, which JUSTICE SCALIA suggests would be a better interpretive guide than preratification Senate materials, see *post,* at 374, would in fact be a worse indicator of a treaty's meaning, for that history is rarely a matter of public record available to the Senate when it decides to grant or withhold its consent.

[8] A new United States-Canada Income Tax Convention became effective August 16, 1984, after the summonses involved in this case were issued. 1986–2 Cum. Bull. 258. Article XXVII of the new Convention closely resembles Articles XIX and XXI of the 1942 Convention. Yet neither the new Convention nor its supplementary protocols suggest any limitation on United States compliance with a treaty request dependent upon the status of a Canadian tax investigation. The hearing before the Senate Foreign Relations Committee, see Hearing on Tax Treaties before the Senate Committee on Foreign Relations, 97th Cong., 1st Sess., 1–115 (1981), the technical explanation of the new Convention, see 1986–2 Cum.

### (3)

Nor do other aids to interpretation strengthen their case. The practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed. See *Trans World Airlines, Inc.* v. *Franklin Mint Corp.*, 466 U. S. 243, 259 (1984); *Factor* v. *Laubenheimer*, 290 U. S. 276, 294–295 (1933). The Government's regular compliance with requests for information by Canadian authorities without inquiring whether they intend to use the information for criminal prosecution therefore weighs in favor of its reading of Articles XIX and XXI. Similarly, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo*, 457 U. S., at 184–185. See also *Kolovrat* v. *Oregon*, 366 U. S. 187, 194 (1961). The IRS' construction of the 1942 Convention repudiates rather than confirms the interpretation respondents ask us to adopt. Finally, the result urged by respondents would contravene Congress' main reason for laying down an easily administrable test in § 7602(c): "[S]ummons enforcement proceedings should be summary in nature and discovery should be limited." S. Rep. No. 97–494, Vol. 1, p. 285 (1982). If respondents had their way, disputes would inevitably arise over whether a Canadian tax investigation had progressed to a point analogous to a Justice Department referral when Revenue Canada made its request for information, thereby "spawn[ing] protracted litigation without any meaningful results for the taxpayer." *Ibid.* It seems unlikely that Congress would have welcomed this re-

---

Bull. 275, 294, and the perfunctory ratification debate in the Senate, see 130 Cong. Rec. 19504–19509, 19512–19513 (1984), are similarly silent on this point. Thus, the Senate apparently did not believe that in ratifying the new Convention it was giving respondents' claim the force of law, just as it did not appear to think, from the legislative history it left behind, that § 7602(c) accomplished that end on its own.

sult when it ratified the 1942 Convention, or that Congress intended it when it approved the bill containing what is presently § 7602(c).

## III

We conclude that the IRS need not attest that a Canadian tax investigation has not yet reached a stage analogous to a Justice Department referral by the IRS in order to obtain enforcement of a summons issued pursuant to a request by Canadian authorities under the 1942 Convention. So long as the IRS itself acts in good faith, as that term was explicated in *United States* v. *Powell*, 379 U. S., at 57–58, and complies with applicable statutes, it is entitled to enforcement of its summons. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring in part and concurring in the judgment.

It is quite unnecessary for the resolution of this case to explore or discuss the Senate proceedings that led to ratification of the 1942 Convention Respecting Double Taxation; for, as the Court unanimously agrees, the text of the Treaty is quite sufficient to decide the issue before us. The intent of the Treaty's signatories is manifest from the language of the document itself. I agree with JUSTICE SCALIA that we should not reach, either in a direct or an implicit way, the question whether Senate debates on ratification are authoritative or even helpful in determining what the signatories to a treaty intended. That determination should be reserved until we confront a case where the language of the treaty itself does not yield a clear answer to the question before us. For these reasons, I join the judgment of the Court and all but Part II–C of the Court's opinion.

JUSTICE SCALIA, concurring in the judgment.

I concur only in the judgment of the Court because I believe that the text of Articles XIX and XXI of the Convention between the United States and Canada Respecting Double Taxation, Mar. 4, 1942, 56 Stat. 1405–1406, T. S. No. 983, is completely dispositive of respondents' claim under the agreement. The Court apparently agrees. See *ante*, at 365–366. Given that the Treaty's language resolves the issue presented, there is no necessity of looking further to discover "the intent of the Treaty parties," *ante*, at 366, and special reason to avoid the particular materials that the Court unnecessarily consults.

I

Of course, no one can be opposed to giving effect to "the intent of the Treaty parties." The critical question, however, is whether that is more reliably and predictably achieved by a rule of construction which credits, when it is clear, the contracting sovereigns' carefully framed and solemnly ratified expression of those intentions and expectations, or rather one which sets judges in various jurisdictions at large to ignore that clear expression and discern a "genuine" contrary intent elsewhere. To ask that question is to answer it.

One can readily understand the appeal of making the additional argument that the plain language of a treaty (which is conclusive) does indeed effectuate the genuine intent as shown elsewhere—just as one can understand the appeal, in statutory cases, of pointing out that what the statute provides (which is conclusive) happens to be sound social policy. But using every string to one's bow in this fashion has unfortunate implications. ("It would be wrong; and besides, it wouldn't work.") Here the implication is that, *had* the extrinsic evidence contradicted the plain language of the Treaty it would govern. That is indeed what we mistakenly said in the earlier case that the Court cites as authority for its approach. In *Sumitomo Shoji America, Inc.* v. *Avagliano,*

457 U. S. 176, 180 (1982), we stated that "'[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.' . . . *Maximov* v. *United States*, 373 U. S. 49, 54 (1963)." The authority quoted for that proposition in fact does not support it. In *Maximov*, confronted with an argument appealing to the "intent or expectations" of the signatories, we responded that "[t]he immediate and compelling answer to this contention is that . . . the language of the Convention itself not only fails to support the petitioner's view, but is contrary to it." *Maximov* v. *United States*, 373 U. S. 49, 54 (1963). We then continued: "Moreover, it is *particularly* inappropriate for a court to sanction a deviation from the clear import of a solemn treaty . . . when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Ibid.* (emphasis added). The import of the highlighted adverb is, of course, that it would be inappropriate to sanction a deviation from clear text *even if there were* indications of contrary intent. Our *Sumitomo* dictum separated the last clause of this quotation from its context to support precisely the opposite of what it said. Regrettably, that passage from *Sumitomo* is already being quoted by lower courts as "[t]he general rule in interpreting treaties." *Rainbow Navigation, Inc.* v. *Department of Navy*, 686 F. Supp. 354, 359, n. 25 (DC 1988).

Notwithstanding the *Sumitomo* dictum to which the Court alludes, our traditional rule of treaty construction is that an agreement's language is the best evidence of its purpose and its parties' intent. In *Rocca* v. *Thompson*, 223 U. S. 317 (1912), it was urged upon us that a Treaty granting consuls the right "to intervene in the possession, administration, and judicial liquidation of the estate of the deceased" also granted them the right to administer the property of the deceased,

since that would effectuate the Treaty's "objects and purposes." We conducted no separate inquiry into the intent or expectations of the signatories beyond those expressed in the text, but said simply:

> "[T]reaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties. Had it been the intention to commit the administration of estates of citizens of one country, dying in another, exclusively to the consul of the foreign nation, it would have been very easy to have declared that purpose in unmistakable terms." *Id.*, at 332.

That is the governing principle of interpretation. Only when a treaty provision is ambiguous have we found it appropriate to give authoritative effect to extratextual materials. See, *e. g.*, *Air France* v. *Saks*, 470 U. S. 392, 400 (1985); *Nielsen* v. *Johnson*, 279 U. S. 47, 52 (1929).

## II

Even, however, if one generally regards the use of preratification extrinsic materials to confirm an unambiguous text as an innocuous practice, there is special reason to object to that superfluous reference in the present case. What is distinctive here is the nature of the extratextual materials to which the Court unnecessarily refers. To discover Canada's and the United States' "intent and expectations," the Court looks solely to the United States Senate floor debates that preceded the President's ratification of the treaty. *Ante,* at 366–368, and nn. 7–8. The use of such materials is unprecedented. Even where the terms of the treaty are ambiguous, and resort to preratification materials is therefore appropriate, I have been unable to discover a single case in which this Court has consulted the Senate debate, committee hearings, or committee reports. It would be no more appropriate for me than it is for the Court to use the present case as the occa-

sion for pronouncing upon the legitimacy of using such materials, but it is permissible to suggest some of the arguments against it.   Using preratification Senate materials, it may be said, is rather like determining the meaning of a bilateral contract between two corporations on the basis of what the board of directors of one of them thought it meant when authorizing the chief executive officer to conclude it.   The question before us in a treaty case is what the two or more sovereigns agreed to, rather than what a single one of them, or the legislature of a single one of them, thought it agreed to.   And to answer that question accurately, it can reasonably be said, whatever extratextual materials are consulted must be materials that reflect the mutual agreement (for example, the negotiating history) rather than a unilateral understanding.   Thus, we have declined to give effect, not merely to Senate debates and committee reports, but even to an explicit condition of ratification adopted by the full Senate, when the President failed to include that in his ratification. We said:

> "The power to make treaties is vested by the Constitution in the President and Senate, and, while this proviso was adopted by the Senate, there is no evidence that it ever received the sanction or approval of the President. It cannot be considered as a legislative act, since the power to legislate is vested in the President, Senate and House of Representatives.   There is something, too, which shocks the conscience in the idea that a treaty can be put forth as embodying the terms of an arrangement with a foreign power or an Indian tribe, a material provision of which is unknown to one of the contracting parties, and is kept in the background to be used by the other only when the exigencies of a particular case may demand it."   *New York Indians* v. *United States*, 170 U. S. 1, 23 (1898).

Of course the Senate has unquestioned power to enforce its own understanding of treaties.   It may, in the form of a reso-

lution, give its consent on the basis of conditions. If these are agreed to by the President and accepted by the other contracting parties, they become part of the treaty and of the law of the United States, see *Northwestern Bands of Shoshone Indians* v. *United States,* 324 U. S. 335, 351–352 (1945); see also Restatement (Third) of Foreign Relations Law of the United States § 314 (1987). If they are not agreed to by the President, his only constitutionally permissible course is to decline to ratify the treaty, and his ratification without the conditions would presumably provide the basis for impeachment. Moreover, if Congress does not like the interpretation that a treaty has been given by the courts or by the President, it may abrogate or amend it as a matter of internal law by simply enacting inconsistent legislation. *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423, 460 (1899); *Head Money Cases,* 112 U. S. 580, 599 (1884). But it is a far cry from all of this to say that the meaning of a treaty can be determined, not by a reservation attached to the President's ratification at the instance of the Senate, nor even by formal resolution of the Senate unmentioned in the President's ratification, but by legislative history of the sort that we have become accustomed to using for purpose of determining the meaning of domestic legislation.

The American Law Institute's Restatement of the Foreign Relations Law of the United States would permit the courts to refer to materials of the sort at issue here. See Restatement (Third) of Foreign Relations Law of the United States § 314, Comment *d* (1987); *id.,* § 325, Reporter's Note 5. But despite the title of the work, this must be regarded as a proposal for change rather than a restatement of existing doctrine, since the commentary refers to not a single case, of this or any other United States court, that has employed the practice. The current version of the Restatement provides no explanation for (or even acknowledgment of) this curiosity. An explanation was provided in the Proposed Official Draft of the Second Restatement, which is of some interest:

"There is virtually no precise decisional authority on this matter, probably because of the domestic interpretative rule, stated in § 155, that executive interpretations of international agreements are given great weight by courts in the United States or because, as explained in Comment *a* to this Section, the courts wish to avoid if possible creating disharmony between the international and the domestic meanings of international agreements." Restatement (Second) of Foreign Relations Law of the United States § 154, Comment *b*(ii) (Prop. Off. Draft 1962).

This is not the case in which to commit ourselves to an approach that significantly reduces what has hitherto been the President's role in the interpretation of treaties, and commits the United States to a form of interpretation plainly out of step with international practice.

It can hardly have escaped the Court's attention that the role of Senate understanding in the treaty ratification process has recently been the subject of some considerable dispute between the Senate and the Executive. See Washington Post, Mar. 19, 1988, p. A11, col. 1 (discussing disagreement on the importance to be accorded to Senate understanding of the Anti-Ballistic Missile Treaty at the time of advice and consent to the President's ratification); Washington Post, Feb. 17, 1988, p. A17, col. 1 (same); Washington Post, Feb. 6, 1988, p. A1, col. 6 (same). The first (and, as far as I am aware, the only) federal decisions relying upon preratification Senate materials for the interpretation of a treaty were issued by the District Court for the District of Columbia, in successive phases of the same controversy, last May, see *Rainbow Navigation, Inc.* v. *Department of Navy*, 686 F. Supp. 354 (1988), and last November, see *Rainbow Navigation, Inc.* v. *Department of Navy*, 699 F. Supp. 339 (1988). In the first of those cases, the court rejected the Government's contention that its representations to the Senate regarding the meaning of a treaty are not binding as to

the treaty's interpretation. See 686 F. Supp., at 357–358, n. 17.*  In the second of them, the Government conceded that "authoritative Executive branch representations concerning the meaning of a Treaty which form part of the basis upon which the Senate gives advice and consent are entitled to be accorded binding weight as a matter of domestic constitutional law, and the Executive branch fully accepts that it is bound by such statements."  699 F. Supp., at 343 (quoting Defendants' Reply Brief and Opposition to Plaintiff's Cross-Motion for Summary Judgment 2, n. 2.).  It is not clear that this latest position taken by the Government in District Court is correct, or would even be the position taken before us by the Solicitor General.  It is even less clear, however, assuming that position to be correct, that Senate understandings which are *not* the product of Executive representations in the advice-and-consent hearings should have any relevance.  It is odd, to say the least, that in the present case, where the language of the Treaty is clear, where the role of Senate reports and debates has not even been argued, and where the Solicitor General has not been requested to give us the benefit of his views on that subject, we should reach out to use such materials for the first time in two centuries of treaty construction.

---

*The court relied in part upon testimony—reproduced in The ABM Treaty Interpretation Resolution, Report of the Committee on Foreign Relations of the United States Senate, S. Rep. No. 100–164, p. 49 (1987)— by none other than the reporter for the Restatement of Foreign Relations Law, Professor Louis Henkin.  Thus, by self-exertion, so to speak, there is now at least one case that the Restatement *almost* restates.  The qualifier is needed because, as I discuss later in text, even that case does not go as far as the Restatement (and the Court's opinion today) would do.