268 F.3d 829 (9th Cir. 2001)
 DP AVIATION, a Washington general partnership consisting of M.C. Pietromonaco, Inc. and Microm, Inc., Washington corporations; M.C. PIETROMONACO, INC., a Washington corporation; MICOM, INC., a Washington corporation, Plaintiffs-Appellees,
v.
SMITHS INDUSTRIES AEROSPACE AND DEFENSE SYSTEMS LTD, a foreign corporation, Defendant-Appellant.
 Nos. 99-35913, 00-35029
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 12, 2001
Filed September 28, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 John T. Petrie and Susan Rae Fox, Ryan, Swanson & Cleveland, PLLC, Seattle, Washington; and Evan L. Schwab, Dorsey & Whitney, LLP, Seattle, Washington, for the plaintiffs-appellees.
 Thomas M. Kittredge and Karen Pieslak Pohlmann, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania; and Patrick C. Sheldon, Fain Sheldon Anderson & VanDerhoef, PLLC, Seattle, Washington, for the defendant-appellant.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-97-01623-TSZ.
 Before: Reinhardt, Wardlaw, and Gould, Circuit Judges.
 RONALD M. GOULD, Circuit Judge:
 
 
 1
 This case concerns a monetary dispute over the award of incentive fees, or commissions, pursuant to a representation agreement. Appellees DP Aviation, M.C. Pietromonaco, Inc., and Micom, Inc. (collectively, "DPA") alleged that Appellant Smiths Industries Aerospace and Defense Systems, Ltd. ("SIADS") breached its representation agreement with DPA by refusing to pay incentive fees on products supplied by SIADS to The Boeing Company ("Boeing"). Following trial, judgment, and supplemental judgment, the district court awarded DPA unpaid incentive fees, underpaid incentive fees for a class of products manufactured by SIADS's Harowe division ("Harowe Products"), and prejudgment interest at twelve percent in accord with Washington law. SIADS appealed. We have jurisdiction pursuant to 28 U.S.C. 1291. We affirm the district court's award to DPA of the unpaid incentive fees and the award of prejudgment interest at twelve percent on the unpaid incentive fees, but vacate its award of underpaid incentive fees on the Harowe Products.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 DPA is a Washington-based general partnership. SIADS is a subsidiary of Smiths Industries, PLC ("SIPLC") (formerly Smiths Industries LTD. ("SILTD")).
 
 
 3
 In 1974, DPA, then known as SP & Associates ("SP&A") (a partnership with principals Michael Pietromonaco and John Still), became the exclusive representative in Washington State for the sale of avionics parts by Smiths Industries Incorporated ("SIINC"), a Florida corporation and a wholly owned subsidiary of SILTD. By the terms of the 1974 Agreement, SP&A assisted SIINC in procuring business with Boeing, and, in return, SP&A was compensated with a $ 50,000 annual retainer fee and incentive fees based on the amount of business gained. In 1978, the 1974 Agreement was modified by another agreement that provided for a similar representation arrangement.
 
 
 4
 In 1980, DPA and SIINC executed an agreement ("1980 Agreement") establishing DPA as the exclusive sales representative within Washington State for certain products manufactured by SIINC and SIADS. The 1980 Agreement was negotiated by Michael Pietromonaco ("Pietromonaco") and his partner, John Dugan ("Dugan"), on behalf of DPA and by SIINC's director of marketing, David Richardson ("Richardson"), on behalf of SIINC.
 
 
 5
 The 1980 Agreement provided that DPA would be paid incentive fees of "2% of the aggregate amount of sales in the Territory" of "Products which constituted New Business" as defined by the 1980 Agreement.[1] The 1980 Agreement was terminable ninety days after either party gave notice of termination. Paragraph 7 provided in part:
 
 
 6
 Notwithstanding termination of this Agreement, incentive fees shall continue to be paid after Termination date on all shipments of Products for which orders were received and accepted before the Termination Date.
 
 
 7
 Richardson and Pietromonaco testified at trial that they understood "orders" in paragraph 7 to mean a contract or commitment to supply product, not a purchase order. Under this interpretation of "orders," DPA would be entitled to a two percent commission on all "New Business" generated before the "Termination Date" even if the commitments or contracts between SIINC or SIADS and Boeing continued after termination.
 
 
 8
 In 1981, DPA and SILTD executed a new sales agreement ("1981 Agreement").[2] The 1981 Agreement, like the 1980 Agreement, provided for DPA's representation on products produced by both SIINC and SIADS. The 1981 Agreement was negotiated by Pietromonaco for DPA and John Rivaz ("Rivaz"), director of planning for SILTD, on behalf of SILTD.
 
 
 9
 The provisions and much of the language of the 1980 and the 1981 Agreements are similar. Paragraph 5(c) of the 1981 Agreement, like paragraph 7 of the 1980 Agreement, provided:
 
 
 10
 Notwithstanding Termination of this Agreement, incentive fees of Section 5b shall continue to be paid after the Termination Date on all New Business for which orders were received and accepted up to ninety (90) days after the Termination Date.
 
 
 11
 Pietromonaco testified that he did not remember the meaning of "orders" in paragraph 5(c) being discussed in negotiations, but he believed that "orders" continued to mean commitments to purchase, not purchase orders. Rivaz of SILTD also testified that the meaning of "orders "was not discussed, but he understood "orders" to mean purchase orders.
 
 
 12
 Significantly, a separate provision discussing DPA's representation duties found in both the 1980 and 1981 Agreements used the term "purchase orders." Pietromonaco and Dugan both testified that the use of the separate terms" purchase order" and "order" in the 1980 Agreement was a deliberate choice to signify distinct concepts. Rivaz testified that the "purchase orders" section just "slipped through" from the 1980 Agreement to the 1981 Agreement.
 
 
 13
 The district court found the following changes from the 1980 to the 1981 Agreements to be material:[3] (1) SILTD became a direct party to the 1981 Agreement; (2) the yearly retainer payment to DPA was phased out after two years; (3) the applicable law governing the agreement was changed from Florida law to English law; (4) a word in the definition of "New Business" was changed from "sales "to "orders"; (5) DPA was to be paid incentive fees on all New Business for ninety days after termination; and (6) commissionable "New Business" was expanded to include products and components manufactured and marketed by Smiths Industries Harowe Division in Malvern, Pennsylvania.
 
 
 14
 In 1985, in recognition of DPA's assistance in securing a commitment from Boeing to continue to purchase parts manufactured by SIADS from its Harowe Division, SIADS agreed to pay DPA one percent commissions on certain parts manufactured at Harowe. DPA would not have otherwise been entitled to incentive fees for these "Harowe Products "because SIADS sold these products to Boeing before 1981, and they did not qualify as "New Business" as defined by the 1981 Agreement.[4]
 
 
 15
 In the mid-1980's, Boeing altered its procurement practices and began using long-term requirements contracts called Special Business Provisions Agreements ("SBPs") to buy products from suppliers. In 1986, some of SIADS's commitments to supply Boeing with products from the Harowe Division were incorporated into a newly issued SBP. DPA continued to receive only the one percent commission that was agreed upon in 1985, not the two percent incentive fees provided by the terms of the 1981 Agreement.
 
 
 16
 In August 1997, SIADS gave notice of its intent to terminate the 1981 Agreement, effective three months later. SIADS also notified DPA that it did not intend to pay the two percent incentive fees for the remaining term of the long-term Boeing contracts that were covered by the 1981 Agreement.[5]
 
 
 17
 DPA filed a complaint in the Superior Court of Washington for King County against SIADS alleging breach of contract, claiming attorneys' fees under Washington wage statutes, and requesting a declaratory judgment arising from the termination of the 1981 Agreement. In its first claim, DPA asserted breach or anticipatory breach of contract because SIADS had "unequivocally indicated that it will refuse to pay Incentive Fee of 2% of the sale price of products for which a purchase order has not been received on or before February 4, 1998." In its claim for declaratory relief, DPA asserted that SIADS's "unequivocal refusal to continue paying a 2% Incentive Fee on the requirements contracts with Boeing is an anticipatory breach" and it further asked for "declaration that [SIADS] is obligated to pay 2% Incentive Fees on all net sales of orders placed with Boeing as a result of efforts of [DPA], whether purchase orders are issued before or after February 4, 1998."
 
 
 18
 SIADS removed DPA's claims to the United States District Court for the Western District of Washington based upon diversity jurisdiction. DPA filed a first amended complaint, adding claims for unjust enrichment and equitable estoppel. After discovery, the district court granted SIADS's motion for summary judgment on the equitable claims and on the Washington wage claims, but denied summary judgment on the contract and declaratory judgment claims.
 
 
 19
 The case was tried without a jury April 12-19, 1999. Trial testimony and evidence focused on the dealings between the parties before and after the execution of the 1981 Agreement and on the meaning of "orders" in paragraph 5(c) of the 1981 Agreement.
 
 
 20
 After trial, the district court issued its Findings of Fact and Conclusions of Law. The district court concluded that the parties intended "orders" in the 1981 Agreement not to be limited to purchase orders, but to include long-term contracts and commitments to supply. The district court concluded that DPA was entitled to two percent incentive fees on all sales of SIADS products identified in Trial Exhibit 1, a chart representing long-term contracts between SIADS and Boeing.
 
 
 21
 DPA filed a proposed judgment, to which SIADS objected on two grounds: (1) prejudgment interest was calculated at twelve percent in accord with Washington law rather than the rate required by English law; and (2) the judgment included SIADS's liability for payment from 1986 onward of two percent incentive fees on the Harowe Products on which DPA had received only a one percent commission since 1985.
 
 
 22
 The district court's judgment ordered SIADS to pay two percent incentive fees for the length of the long-term Boeing contracts. The judgment also required SIADS to provide a list of the Harowe Products for which SIADS had paid an incentive fee of one percent to allow the district court to enter a supplemental judgment for the difference between the one percent paid and two percent owed. SIADS filed its notice of appeal contesting the judgment.
 
 
 23
 DPA filed a motion for entry of supplemental judgment. After SIADS gave an accounting of the Harowe Products, the district court entered a supplemental judgment totaling $ 2,755,432. The supplemental judgment included two percent incentive fees unpaid from 1997 to the judgment date, plus prejudgment interest calculated at twelve percent; and one percent underpayment on incentives fees on the Harowe Products from May 1986 through July 1999, plus prejudgment interest.
 
 
 24
 SIADS filed a second notice of appeal contesting the supplemental judgment.
 
 DISCUSSION
 I. Interpretation of the 1981 Agreement
 
 25
 SIADS contends that the district court (1) erred in interpreting Washington State contract law; (2) improperly admitted extrinsic evidence in interpreting the 1981 Agreement; and (3) made clearly erroneous factual findings and erroneous legal conclusions based on these findings. We review the interpretation and meaning of contract provisions de novo. Mendler v. Winterland Prod., Ltd., 207 F.3d 1119, 1121 (9th Cir. 2000). When a district court uses extrinsic evidence to interpret a contract, we review the findings of fact for clear error and the principles of law applied to those facts de novo. United States ex rel. Lindenthal v. Gen. Dynamics Corp., 61 F.3d 1402, 1412 (9th Cir. 1995). We review the district court's admission of evidence for abuse of discretion. Lambert v. Ackerley, 180 F.3d 997, 1009 n. 12 (9th Cir. 1999) (en banc).
 
 
 26
 We first consider SIADS's contention that the district court misinterpreted Washington's contract law.[6] SIADS argues that Syputa v. Druck Inc., 90 Wn. App. 638, 954 P.2d 279 (Wash. Ct. App. 1998), mandates the conclusion that the term "orders" in the 1981 Agreement means "purchase orders." We disagree.
 
 
 27
 In Syputa, a manufacturer of aircraft parts entered into a manufacturer's representation contract for assistance in securing contracts with Boeing. 954 P.2d at 280. The contract provided for a commission payable on "all orders received." Id. at 281. Upon termination of the contract, plaintiff claimed commissions for all long-term contracts; defendant contended that it only owed commissions for purchase orders. The court found that "orders" referred to purchase orders, concluding that "although [plaintiff] asserts that the parties mutually intended to define the placement of orders as meaning the placement of requirements contracts, the record is devoid of evidence that the parties mutually intended such a definition." Id. at 282 (emphasis in original). Finding the meaning of "orders" clear from the terms of the contract and citing the absence of contractual terms addressing post-termination commissions, the court affirmed the trial court's interpretation of "orders" to mean "purchase orders." Id. at 282-83.
 
 
 28
 SIADS argues that, absent evidence of the parties' mutual intent to the contrary, Syputa requires the term "orders" in a manufacturer's representative contract to be interpreted as "purchase orders" and not long-term contracts. We disagree and conclude that Syputa does not establish such a presumption. The Syputa court engaged in a case-specific inquiry, finding that the contract: (1) "does not provide specific terms addressing post-termination commissions"; and (2) when discussing orders "refers to specific products that are listed in the [contract] appendix." Id. at 282. The Syputa court's determination of the mutually intended meaning of "orders" there cannot control an assessment of the intention of the parties here. The language and structure of the 1981 Agreement and the extrinsic evidence relating to it support an interpretation of "orders" here different from that in Syputa.
 
 
 29
 Washington law holds that "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." Berg v. Hudesman, 115 Wn.2d 657, 801 P.2d 222, 229 (Wash. 1990). In Berg, the Washington Supreme Court also expressly adopted the RESTATEMENT (SECOND) OF CONTRACTS 212, 214(c) (1981) to determine the intent of contracting parties. 801 P.2d at 229. Section 212 provides:
 
 
 30
 (1) The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances, in accordance with the rules stated in this Chapter.
 
 
 31
 (2) A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.
 
 
 32
 Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.
 
 
 33
 801 P.2d at 229 (quoting RESTATEMENT (SECOND) OF CONTRACTS 212 (1981)). Berg also relied on comment b to that section, which provides, in part:Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.
 
 
 34
 801 P.2d at 229 (quoting RESTATEMENT (SECOND) OF CONTRACTS 212 cmt. b).
 
 
 35
 Here, the meaning of the term" orders" is ambiguous and does not clearly point to "purchase orders "as in Syputa. The 1981 Agreement uses the term "purchase orders "in a separate contractual clause and uses "orders" when discussing payment of post-termination incentive fees. See Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 952 P.2d 590, 597 (Wash. 1998) (holding that a court "must interpret [a contract] as a whole, giving reasonable effect to each of its parts").
 
 
 36
 Correctly recognizing that Syputa was not necessarily controlling, the district court properly assessed and weighed evidence pertinent to the parties' intentions. The district court assiduously examined the evidence of the parties' intent. The district court considered pre-and post-agreement extrinsic evidence to conclude that the parties mutually intended "orders" to refer to long-term contracts and commitments to supply.
 
 
 37
 We next consider SIADS's contentions that much of the trial testimony and evidence was inadmissible under Washington contract law. SIADS objected at trial to testimony of both Pietromonaco and Richardson regarding their understanding of the meaning of "orders" in the 1980 Agreement and Pietromonaco's testimony concerning "orders "in the 1981 Agreement on grounds that it represented the individuals' subjective intent and was not relevant to the meaning of orders in the 1981 Agreement.
 
 
 38
 The RESTATEMENT (SECOND) OF CONTRACTS 212, 214(c) (1981), adopted by the Berg court and set out in part above, permits the district court to determine the intent of contracting parties from extrinsic evidence including the relations of the parties, their prior negotiations, and their course of dealing. Berg also expressly approved of the method of determining contractual intent articulated in Stender v. Twin City Foods, Inc., 82 Wn.2d 250, 510 P.2d 221 (1973), Berg, 801 P.2d at 229, which instructs the court to consider, in addition to the language of the contract, extrinsic evidence, including "the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." Berg, 801 P.2d at 228 (quoting Stender, 82 Wn.2d at 254) (internal quotation marks omitted). See also Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc., 120 Wn.2d 573, 844 P.2d 428, 432 (Wash. 1993).
 
 
 39
 In In re Marriage of Schweitzer, 132 Wn.2d 318, 937 P.2d 1062 (Wash. 1997), the Washington Supreme Court explained that its earlier decision in Berg:
 
 
 40
 authorizes the use of extrinsic evidence only to elucidate the meaning of the words of a contract, and "not for the purpose of showing intention independent of the instrument." We emphasized, "it is the duty of the court to declare the meaning of what is written, and not what was intended to be written." We accordingly held in Berg that parol evidence cannot be used to "add[]to, modify[], or contradict[]the terms of a written contract, in the absence of fraud, accident or mistake."Id. at 1066 (internal citations omitted) (alterations in the original). See also Hollis v. Garwall, Inc., 137 Wn.2d 683, 974 P.2d 836, 843 (Wash. 1999) (holding inadmissable "evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term").
 
 
 41
 The district court's detailed examination of evidence of the parties' intentions as manifested in the agreement's language cannot properly be considered to be a judicial redrafting of the written terms of the agreement, nor is this evidence of merely one party's subjective intent. With respect to the 1980 Agreement, Richardson testified to the same understanding of "orders" as the witnesses for DPA. Richardson testified that the contract language was a result of a discussion between the parties. The district court found that his testimony was "credible and very helpful in determining the intent of the parties."
 
 
 42
 The district court found that evidence of the 1980 negotiations and subsequent agreement was relevant in interpreting "orders" in the 1981 Agreement. The district court found that the 1980 Agreement was used as a template for the 1981 Agreement and that Rivaz never disclosed a contrary intention to DPA during the 1981 negotiations. The district court did not abuse its discretion in determining relevance. See United States v. Bensimon, 172 F.3d 1121, 1130 (9th Cir. 1999). Although SIADS was not a party to the earlier agreement, SIADS and DPA undertook certain reciprocal obligations and rights pursuant to it. The 1980 Agreement: (1) made DPA the exclusive representative for the sale of products manufactured by both SIINC and SIADS; (2) obligated DPA to promote diligently sales of both SIINC and SIADS products; (3) obligated both SIINC and SIADS to pay DPA the two percent incentive fee; and (4) allowed SIADS the right, independent of SIINC, to terminate the agreement in the event that DPA represented a competitor or did not otherwise honor its obligations.
 
 
 43
 SIADS also contends that the district court improperly "pierced the corporate veil" and imputed the subsidiary SIINC's interpretation of "orders" in 1980 to its parent corporation, SILTD, in 1981. This argument is not persuasive and misconstrues the doctrine governing piercing the corporate veil. The district court did not hold SILTD liable for any obligation of a subsidiary such as SIINC. The district court did not impute knowledge or intent from SIINC to SILTD, nor pierce any corporate veil, but simply admitted relevant evidence of the facts surrounding the execution of the 1980 Agreement to assist its interpretation of the 1981 Agreement. Under Washington contract law, the district court properly considered such evidence of what is indisputably a related contract.
 
 
 44
 SIADS similarly challenges the admission at trial of internal memoranda and testimony of SIADS management concerning its understanding of the meaning of "orders" based on its actions in the 1990's on the grounds of relevancy and subjective intent. The challenged evidence includes: (1) an internal SIADS memorandum dated July 1995, stating that after termination DPA "would also continue to be entitled to on-going commission on that captured business" and noting that DPA's contract position is "strong"; (2) internal SIADS's documents showing that SIADS was aware of DPA's contrary interpretation of "orders" when SIADS agreed in 1994 and 1995 to amendments to the 1981 Agreement that continued to use the term but did not disclose a contrary interpretation of "orders" to DPA during negotiations; and (3) internal documents and testimony concerning SIADS's intention to enter into a new agreement with DPA to "re-establish and clarify" the contract. SIADS contends that the 1981 Agreement was executed more than ten years before these internal documents were circulated and dismisses this evidence as post hoc statements taken out of context of "what some Smith PLC employees viewed as 'fair.'"
 
 
 45
 We hold that the district court did not abuse its discretion in admitting the challenged evidence. This evidence was properly admissible because it is part of the relationship and course of dealing between the parties and is relevant in explaining how the parties interpreted the terms of the 1981 Agreement when entering into the agreement.
 
 
 46
 We further consider and reject SIADS's contention that the district court's factual findings relating to the extrinsic evidence were clearly erroneous. Significantly, the district court's finding that the 1980 Agreement "was used as a template for creating the 1981 Agreement" and that the meaning of "orders" was not materially changed is supported by the text of the agreements and the testimony of the negotiators. This key finding is not clearly erroneous.
 
 
 47
 SIADS also challenges many of the district court's findings of fact concerning the conduct and behavior of the parties after the execution of the 1981 Agreement. We reject this challenge to the district court's factfinding. This was a hard fought case with excellent representation and spirited advocacy on both sides. In the end, the district court as trier of fact was required to decide key facts pertinent to the interpretation of the agreement. More than one version of the evidence and the 1981 Agreement was presented in the witnesses's testimony on both sides. Despite its vigorous advocacy, SIADS has not established that the district court's findings were clearly erroneous. The district court's findings are supported by substantial evidence and it cannot be said that they are not plausible on this record.[7] To the extent that the district court made legal conclusions about the interpretation of the 1981 Agreement based on these findings, we find no error.
 
 
 48
 We hold that the district court correctly interpreted "orders" to mean long-term contracts and commitments to supply. We affirm the district court's award to DPA of the two percent unpaid incentive fees.
 
 
 49
 II. Notice and Proof of Harowe Products Claims
 
 
 50
 SIADS contends that because DPA did not provide SIADS with adequate notice of the Harowe Products underpayment claims and proof of liability had not been established at trial, the district court's award of the underpaid incentive fees cannot stand. We review the district court's decision to grant or deny declaratory relief de novo. Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1212 (9th Cir. 1999). We agree with SIADS and vacate the award on the Harowe Products underpayment claims.
 
 
 51
 DPA argues that it was evident from the complaint, pretrial order, trial evidence, and the district court's legal conclusions and factual findings that DPA provided notice of a claim for the one percent underpayment of incentive fees on the Harowe Products covered by the 1986 SBP contract. DPA argues that it always was seeking two percent incentive fees on work subject to commission under the 1981 Agreement and consistently sought declaratory relief that it was entitled to two percent incentive fees on orders before or after February 4, 1998, even though it was unaware of the extent of underpayment. Further, DPA argues that there was substantial evidence in the record establishing that the Harowe Products were in fact "recompeted or renegotiated" and hence commissionable at two percent.
 
 
 52
 SIADS contends that DPA never raised a claim for incentive fees owed for underpayment of the Harowe Products before DPA's submission of a proposed judgment after trial. SIADS argues that the pretrial order and trial itself only concerned recovery of two percent incentive fees due after termination of the 1981 Agreement. SIADS argues that because it did not have fair notice of the underpayment claims, it was unable to raise affirmative defenses and introduce evidence and testimony refuting the two percent incentive fees that it thinks were belatedly claimed for the Harowe Products. SIADS further contends that there was no trial testimony or evidence where DPA claimed that the one percent commission it received on these products should have been two percent, and there is insufficient evidence for the district court to find these damages.
 
 
 53
 In its amended complaint, DPA first asserted a "failure to pay the Incentive Fee on long term requirements with Boeing but for which purchase orders have not been issued prior to February 4, 1998," claiming that this "is a breach or anticipatory breach of the Agreement." DPA also sought declaratory relief that "Smiths' unequivocal refusal to continue paying a 2% Incentive Fee on the requirements contracts with Boeing is an anticipatory breach of the Agreement" and requested "a declaration that Smiths is obligated to pay 2% Incentive Fees on all net sales of orders placed with Boeing as a result of the efforts of DP Aviation, whether purchase orders are issued before or after February 4, 1998." In its prayer, DPA requested a "declaration . . . that defendant owes plaintiff Incentive Fees of approximately $ 2,000,000 annually on the orders of approximately $ 100,000,000 annually to be scheduled for shipment to The Boeing Company."
 
 
 54
 The pretrial order incorporated language virtually identical to the provisions in the amended complaint; DPA requested "[a] declaration that Smiths is obligated to pay 2% commission on all net sales of orders placed with Boeing as a result of efforts of the DP Aviation, whether purchase orders are issued before or after February 4, 1998." Federal Rule of Civil Procedure 16(e) states that a pretrial order" shall control the subsequent course of the action unless modified by a subsequent order." We have held that "[a] pretrial order . . . should be liberally construed to permit any issues at trial that are 'embraced within its language. '" Miller v. Safeco Title Ins. Co., 758 F.2d 364, 368 (9th Cir. 1985) (quoting United States v. First Nat'l Bank of Circle, 652 F.2d 882, 886-87 (9th Cir. 1981)). However, "particular evidence or theories which are not at least implicitly included in the order are barred unless the order is first 'modified to prevent manifest injustice. '" First Nat'l Bank of Circle, 652 F.2d at 886-87 (quoting FED. R. CIV. P. 16).
 
 
 55
 DPA interprets the pretrial order language as supporting its contention that it consistently sought incentive fees from orders before and after the Termination Date. In contrast, referring to the complaint language,[8] SIADS argues that the pretrial order indicates only that DPA was seeking to have incentive fees after the Termination Date treated the same as incentive fees before the Termination Date. SIADS contends that its interpretation of the language is reasonable, and DPA's is not, because DPA initiated its action only after receiving notice that SIADS would not pay DPA incentive fees after termination. SIADS also points to the language in the prayer that the incentive fees are owed on orders "scheduled for shipment" to Boeing, not for past orders like the allegedly underpaid Harowe Products incentive fees.
 
 
 56
 The scope of DPA's pretrial contentions -- and consequently whether fair notice was given to SIADS -- presents a close issue, and neither party's position is frivolous. The language of the complaint and pretrial order is not clear. Standing alone that language might support either party's contention. On the one hand, DPA's pretrial order language might be stretched to cover an underpayment on certain Harowe products before termination. Thus, SIADS's position can be criticized because it appears SIADS did not protect itself by pinning down the scope of the contention by interrogatories, requests for admissions, or other discovery devices. On the other hand, the lawsuit was doubtless precipitated by SIADS's termination of payment of incentive fees upon termination of the relationship. The specific details alleged in both complaint and pretrial order contentions are essentially related to the issue whether the contract should be interpreted to require incentive payments to continue after termination on long-term business previously brought to SIADS by DPA. And that is the issue on which the district court's findings of fact are focused.
 
 
 57
 The parties' arguments at trial, trial testimony, exhibits, and record together persuade us that SIADS's interpretation of the language of the pretrial order is more reasonable and should be accepted here. In this case, some arguments not advanced and evidence not introduced at trial are instructive. In its opening statement, DPA said that it was seeking two percent incentives fees pursuant to the 1981 Agreement for" orders that are already in place and . . . an accounting from Smiths for orders that have come in since the termination decision and an accounting in the future." However, in its opening statement, DPA framed the issues for trial as concerning the interpretation of "orders" in the 1981 Agreement and its significance for nonpayment of two percent incentive fees; DPA did not expressly claim that it was seeking underpaid incentive fees on the Harowe Products. At trial, no witnesses for DPA claimed that SIADS had underpaid Harowe Products incentive fees or otherwise had improperly underpaid commissions before termination.[9] Naturally, witnesses for SIADS did not dispute such allegations because they were never explicitly made. And none of the trial exhibits refer to any underpayment of incentive fees on the Harowe Products. Similarly, in closing argument, DPA focused on the meaning of "orders" and there was no mention of underpaid incentive fees. We conclude that SIADS did not have fair notice of the claims for underpayment of the Harowe Products incentive fees.
 
 
 58
 We have considered testimony and evidence at trial to which DPA refers to support the proposition that the Harowe Products incentive fees were properly within the scope of the pretrial order. Clark, a SIADS witness, testified that a SBP long-term contract was issued for the Harowe Products in 1986. But he referred to no underpayment on commissions that were paid. In addition, Pietromonaco, when asked if Exhibit 1, which included the Harowe Products, represented "contracts that are still in place on which you claim your 2 percent" said yes. But this response is at least ambiguous because it does not expressly claim past underpayment of incentive fees. It is true that SIADS never asserted as a "defense" at trial that certain work was only subject to one percent commission. But it is also true that DPA never asserted that it had been underpaid on past commissions received.
 
 
 59
 In view of the ambiguous language of the pretrial order, the scope of the opening statement of DPA, the content of trial testimony from DPA's witnesses, and the confirmation of the same themes in closing argument, we conclude that underpayment of incentive fees on the Harowe Products was not raised with fair notice to SIADS.
 
 
 60
 We disagree that the evidence stressed by DPA, and apparently relied upon by the district court in part,[10] provided SIADS with proper notice of these claims. In the context of a seven-day trial, these isolated references were inadequate to provide fair notice of a claim by DPA that it had been underpaid on any incentive fees. Certainly it would not have been difficult for DPA to make a short and plain statement claiming that it was underpaid on certain incentive fees.
 
 
 61
 SIADS did not receive adequate notice of the Harowe Products underpayment claims and was thereby prejudiced because it did not have the opportunity to raise possible defenses to these claims, including a statute of limitations defense.[11] Because notice was inadequate, SIADS did not have a fair opportunity to present evidence refuting the underpayment claims.[12] See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 94 L. Ed. 865, 70 S. Ct. 652 (1950) (requiring" notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").[13]
 
 
 62
 Even if SIADS had received fair notice of the Harowe Products underpayment claims, there was insufficient proof at trial establishing that the Harowe Products were" recompeted or renegotiated" under the terms of the 1981 Agreement. The 1981 Agreement included in the definition of "New Business" commissionable at two percent all previously manufactured (before December 1, 1981) Harowe Products that were" recompeted or renegotiated." In 1985, SIADS agreed to pay DPA a one percent commission on Harowe orders that DPA had assisted in procuring. Under the terms of the 1981 Agreement, DPA was not otherwise entitled to any commission on the orders because they continued to be applied to an existing aircraft type on which they had been installed. The Harowe Products are commissionable at two percent only if DPA had established that they were "recompeted or renegotiated."
 
 
 63
 DPA points to the district court's factual finding that Exhibit 14, the 1986 letter agreement for the Harowe Products executed by Boeing before the issuance of the SBP," constituted 'orders' as the parties intended that term to mean." Trial testimony and evidence, however, does not support the inference that the mere issuance of the letter agreement or the SBP is sufficient to prove that the products were" recompeted or renegotiated."
 
 
 64
 Additional trial evidence cited by DPA to prove that the Harowe Products were "recompeted or renegotiated "is unconvincing. Clark testified that before it became Boeing's practice to issue SBPs, every year there would be a" negotiation" of prices and quantities of products for the next year's purchase orders. After being referred by counsel to Exhibit A-71, the Harowe SBP at issue, Clark testified that the SBP was a long-term contract that set prices, but not quantity, over a few years and made yearly negotiations unnecessary. DPA also cites the deposition of Collins, a former SIADS's employee, where he is asked his opinion whether after a "recompeting process," SIADS would "enter into a General Terms Agreement and a Special Business Provisions SBP document with Boeing." He responded: "Again, I would expect so. I don't know specifically. I would expect so if that was their policy, surely."
 
 
 65
 The testimony and depositions show that the parties were addressing the relevance of Boeing's adoption of SBPs in the mid-1980s for determining the proper meaning of" orders" in the 1981 Agreement, not the incentive fees due for the Harowe Products or whether these products had been" recompeted or renegotiated." We conclude that DPA did not meet its burden in proving entitlement to the two percent incentive fees on the Harowe Products.
 
 
 66
 Because there was not adequate notice for the Harowe Products incentive fees and liability for them was not established at trial, we vacate the supplemental judgment for these commissions.
 
 III. Prejudgment Interest
 
 67
 SIADS contends that the district court erred by failing to apply English law to calculate prejudgment interest on its contract claim award. We disagree because SIADS failed to provide reasonable notice of English law under the notice of foreign law requirement of Federal Rule of Civil Procedure 44.1 ("Rule 44.1").
 
 
 68
 The 1981 Agreement includes a choice of law provision that states that "this Agreement shall be construed and governed by English law." The complaint and answer do not mention the potential application of English law, and the pre-trial order does not refer to English law. Similarly, in pretrial briefing to the district court, neither party urged the application of English law or cited a conflict with Washington law. Instead, both parties argued Washington law.
 
 
 69
 In its Findings of Fact and Conclusions of Law, the district court applied Washington law because Washington's principles governing conflict of laws require the application of Washington substantive law unless a conflict of law is presented to the court.[14] Burnside v. Simpson Paper Co., 123 Wn.2d 93, 864 P.2d 937, 942 (Wash. 1994). We agree with the district court on this principle, the propriety of which is not disputed.
 
 
 70
 After trial and the district court's finding of SIADS's liability for unpaid incentive fees, DPA submitted a proposed judgment. The proposed judgment calculated prejudgment interest on the unpaid incentive fees at twelve percent in accordance with the interest rate provided under Washington law. SIADS objected and, in subsequent briefing, urged the district court to apply English law on prejudgment interest. SIADS submitted an affidavit from an English barrister ("Briggs affidavit"), attesting to a lower interest rate under English law. In response, DPA argued that the appeal to foreign law was procedurally barred because SIADS failed to provide reasonable notice of foreign law under Rule 44.1, and, even if the choice of law provision in the 1981 Agreement was properly before the district court, an application of Washington conflict of laws principles would require the application to Washington law to prejudgment interest. The district court calculated prejudgment interest according to Washington law in its judgment and supplemental judgment.
 
 
 71
 We review de novo a district court's decision concerning the appropriate choice of law. Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663, 667 (9th Cir. 1997). We also review de novo a district court's interpretation of the Federal Rules of Civil Procedure as an application of law. Atchison, Topeka & Santa Fe Ry. Co. v. Hercules, Inc., 146 F.3d 1071, 1073 (9th Cir. 1998). Because Rule 44.1 grants the district court discretion in determining "reasonable" notice, we review the district court's application of this standard for abuse of discretion.[15]
 
 
 72
 Rule 44.1 provides, in part, that"[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." FED. R. CIV. P. 44.1.[16] Because SIADS did not provide notice of the applicability of foreign law by its pleadings, the controlling issue here is whether SIADS otherwise gave reasonable notice of its position that English law governed prejudgment interest.
 
 
 73
 SIADS argues that it provided notice of its intention to raise English law in its pretrial memorandum in support of its motion for summary judgment. Referring to the applicable law for interpreting the Agreement, the memorandum states: "it does not appear that the law of Washington is materially different from English law on these issues." This statement does not explicitly say that English law governs prejudgment interest. As SIADS was disclosing no material difference between English and Washington substantive law of contract, it cannot fairly be said that SIADS was implying that such a difference existed for prejudgment interest.
 
 
 74
 The primary purpose of Rule 44.1's notice requirement is to avoid unfairly surprising opposing parties. FED. R. CIV. P. 44.1 Advisory Committee's note; Stuart v. United States, 813 F.2d 243, 251 (9th Cir. 1987), rev'd on other grounds, 489 U.S. 353, 103 L. Ed. 2d 388, 109 S. Ct. 1183 (1989); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure 2444 (2d ed. 1995) (explaining that Rule 44.1 "recognizes that notice should be given . . . in order to avoid unfair surprise either to the opposing party or to the court"). DPA cites Wright and Miller: "Written notice at trial may be reasonable if the issue was not apparent until then. However, in the absence of extenuating circumstances, a party should not be permitted to raise an issue of foreign law after the final pretrial conference described in Rule 16 has been held." Id. (footnotes omitted).
 
 
 75
 We agree that notice of intent to raise an issue of foreign law, if not given in the pleadings, generally should be given before or during the pretrial conference, and normally a contention of application of foreign law should be disclosed at the latest in the pretrial order.[17] It is only fair to provide notice of potential application of foreign law as early as is practicable and, in any event, at a time that is reasonable in light of the interests of all parties and the court. Nonetheless, Rule 44.1 does not require in all cases a cut-off date after which notice cannot be deemed reasonable. The Advisory Committee Notes to Rule 44.1 shed light on this issue:
 
 
 76
 [Notice] may, but need not be, incorporated in the pleadings. In some situations the pertinence of foreign law is apparent from the outset; accordingly the necessary investigation of that law will have been accomplished by the party at the pleading stage, and the notice can be given conveniently in the pleadings. In other situations the pertinence of foreign law may remain doubtful until the case is further developed. . . .
 
 
 77
 The new rule does not attempt to set any definite limit on the party's time for giving the notice of an issue of foreign law; in some cases the issue may not become apparent until the trial and notice then given may still be reasonable. The stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised, are among the factors which the court should consider in deciding a question of the reasonableness of a notice.
 
 
 78
 FED. R. CIV. P. 44.1 Advisory Committee's note.
 
 
 79
 We have previously said that Rule 44.1 allows the court to consider issues of foreign law at any time and that "absent special circumstances, parties should present issues of foreign law in their appellate briefs at the latest." Stuart, 813 F.2d at 251. However, the circumstances of Stuart are different from those here. Stuart involved an interpretation of tax treaties between the United States and Canada and whether, under the applicable treaty, the good faith doctrine applied to summonses issued by the United States in support of a Canadian tax investigation. The good faith issue relevant to submissions of foreign law was whether the Canadian tax investigation had become a criminal investigation by progressing to a stage analogous to a Justice Department referral. Id. at 249-50. After oral argument on appeal, the IRS attempted to submit under Rule 44.1 portions of the Canadian tax authority's operations manual to bolster its position that it had made a prima facie showing of the IRS's good faith in determining that the Canadian authority had not commenced a criminal investigation. Id. at 250. We rejected the supplemental submissions. As we explained, "in fairness to [the opposing party] and in order to encourage early submission of such material in the future," we declined to consider this submission and decided the issue of foreign law based on briefs and argument. Id. at 251.
 
 
 80
 In Stuart, the issue of Canadian law was already in issue at trial. The question was only whether supplementary materials could be referred to for the first time after briefing and argument. Although in Stuart we left open the possibility that there may be some circumstances in which consideration of foreign law may be appropriate after trial and on appeal (but not for the first time after oral argument), that is not the normal practice consistent with Rule 44.1's requirement of reasonable notice.
 
 
 81
 Absent extenuating circumstances, notice of issues of foreign law that reasonably would be expected to be part of the proceedings should be provided in the pretrial conference and contentions about applicability of foreign law should be incorporated in the pretrial order.[18] This gives parties ample opportunity to marshal resources pertinent to foreign law, which normally will not be as well known as domestic law to parties and courts. In some cases foreign law may be proved by reference to authorities; in others foreign law experts may testify.[19] Interests of judicial economy favor early notice so that the parties may plan and present argument on any issues pertinent to an application of foreign law.
 
 
 82
 SIADS contends that the issue of prejudgment interest and the conflict with Washington law were not properly before the district court until DPA submitted its proposed judgment. SIADS argues in effect that it should not be required to give notice on the foreign law governing prejudgment interest unless and until its liability was determined. However, SIADS should reasonably have expected that prejudgment interest would be an issue if liability were determined. We see no reason in law or policy to condone a belated notice of contention of application of foreign law on an issue that reasonably can be anticipated.[20] SIADS had notified DPA that it did not intend to pay DPA incentive fees on long-term contracts SIADS held with Boeing that extended through 2002 and, in some cases, 2006. SIADS stopped paying DPA these incentive fees in 1997, and DPA's contract claims were for payment of these incentive fees for the full extent of the long-term contracts. The probability of a request for prejudgment interest was not speculative, but rather was almost certain to follow if DPA prevailed on its contract claims.
 
 
 83
 SIADS encouraged the district court to apply Washington law to interpret the Agreement's terms, contending that there was no applicable difference between Washington and English contract law. Perhaps this was for a strategic reason because of SIADS's argument that the Washington case, Syputa, was controlling. In any event, if SIADS believed that the choice of law provision did present a conflict with Washington law on prejudgment interest, then it had ample opportunity to point this out to the district court and to the opposing parties in a reasonable way at an earlier time.
 
 
 84
 SIADS contends that DPA was not prejudiced by the lack of prior notice because DPA had adequate opportunity in the district court to brief the application of English law. After receiving DPA's proposed judgment, the district court directed the parties to prepare briefing on, among other issues, the application of English law to prejudgment interest. SIADS in its brief argued that English law was not procedurally defaulted and should be applied pursuant to Washington conflict of laws rules. Attached to the brief, SIADS produced the Briggs affidavit, which attested to the applicable interest rates under English law and appended foreign law review articles and judicial opinions. DPA replied to the procedural and conflict of laws arguments, but did not respond to the substance of English law in the Briggs affidavit. SIADS argues that DPA had "ample opportunity to submit a countervailing affidavit and/or request a hearing if it felt that one was necessary to 'test' the evidence."
 
 
 85
 We reject SIADS's argument. SIADS could have anticipated the issue of prejudgment interest and given notice before the pretrial conference. No extenuating circumstances were presented by SIADS to show that prior notice was impracticable or that the need for notice was not reasonably foreseeable. Any procedure needed to resolve application or substance of foreign law should have been addressed in the pretrial order. We cannot say with confidence that DPA was not prejudiced by the late timing of the notice. Also, earlier notice would have aided the district court's planning for trial and its decision on applicability and substance of foreign law.
 
 
 86
 It was within the district court's sound discretion to conclude that English law would not be applied to calculate prejudgment interest and that instead Washington law, which was the law of the forum and had governed the contract claims, would be applied.[21] We affirm this decision because SIADS did not provide reasonable notice under Rule 44.1 of its intent to raise this issue of foreign law.
 
 CONCLUSION
 
 87
 We affirm the district court's judgment and supplemental judgment for DPA with respect to its award of unpaid two percent incentive fees on products manufactured in SIADS's Cheltenham, Grand Rapids, and Malvern facilities. We affirm the district court's decision to apply Washington law to calculate prejudgment interest at twelve percent. We vacate the district court's judgment and supplemental judgment for DPA with respect to the award of one percent underpayment of incentive fees for the subset of products manufactured at the Malvern facility (the Harowe Products). We remand to the district court for further proceedings consistent with this disposition.
 
 
 88
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 "'New Business' shall mean sales after the Effective Date, resulting in whole or in part from [DPA's] services under this Agreement . . . ."
 
 
 [2]
 The agreement explained: "This is the Agreement between Smiths Industries Limited [SILTD] trading as Smiths Industries Aerospace and Defence Systems Company [SIADS] . . . and DP Aviation . . . ."
 
 
 [3]
 The parties do not dispute these factual findings, only the implications of the material changes between the 1980 and 1981 Agreements.
 
 
 [4]
 The 1981 Agreement provides:
 "New Business" shall mean all orders received from persons in the Territory after June 1, 1975 for products and components of assemblies thereof which the Company manufactures and markets within its Basingstoke, Cheltenham, Clearwater and Putney Divisions and after December 1, 1981 within its Harowe Division. Orders after June 1, 1975, for Basingstoke, Cheltenham, Clearwater and Putney Products, and after December 1, 1981 for Harowe Products which the Company previously manufactured and sold in the Territory, and are not recompeted or renegotiated during the term of this Agreement, and orders for overhaul and repair shall not be considered to be New Business notwithstanding the Representative's activities in regard to such orders, unless these orders are applied to an aircraft or missile type on which they had not previously been installed.
 
 
 [5]
 Most of these contracts terminate at the end of 2002, but some do not terminate until the end of 2006.
 
 
 [6]
 The parties agree that, irrespective of the forum selection clause providing for English law, the district court was correct in applying Washington law to the interpretation of the 1981 Agreement because neither party presented a conflict of laws to the district court, and both urged the application of Washington law to the district court.
 
 
 [7]
 SIADS also challenges the district court's factual findings relating to DPA's execution of "Alvis"-type representation agreements with other manufactures where the terms "orders" and" purchase orders" were used interchangeably to denote purchase orders. The district court found that the Alvis agreements were not negotiated by Dugan and Pietromonaco and involved small projects unlike the sustained efforts required to capture new business with Boeing. These findings are not clearly erroneous, and the existence of these agreements does not call into question the district court's interpretation of the 1981 Agreement.
 
 
 [8]
 We have held that "[a] pretrial order generally supersedes the pleadings, and the parties are bound by its contents." Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993). We follow this rule here by looking to the pretrial order in determining the scope of the claims presented. However, because of the similarity of the language in the complaint and the pretrial order, reference to the complaint here is helpful in interpreting the language in the pretrial order, along with other evidence pertinent to the scope of DPA's pretrial contentions.
 
 
 [9]
 Trial testimony concerning SIADS's agreement in 1985 to pay one percent commissions on the Harowe Products did not provide SIADS with notice that underpayment of commissions were in dispute. At trial, DPA's counsel questioned Pietromonaco on the 1985 agreement to establish the meaning of "orders" in the 1981 Agreement. When asked by the district court whether there was "a dispute with respect to this Harowe business," DPA's counsel replied, "No, Your Honor." It is ambiguous from the context of this testimony whether DPA, as SIADS contends, was expressly disavowing claims for further incentive fees on the Harowe Products. In any event, counsel's response here did not give SIADS notice that underpaid incentive fees on the Harowe Products were claimed by DPA, if such was notice was not otherwise provided.
 
 
 [10]
 Although the district court made meticulous findings of fact and conclusions of law on the disputed contract interpretation issues, the district court did not make explicit findings of fact related to notice of underpayment on the Harowe Products, nor to entitlement of two percent incentive fees on the Harowe Products. These issues came into focus only in the proceedings relating to submission of judgment and supplemental judgment. The district court rejected SIADS's objections and issued a judgment and supplemental judgment permitting recovery of underpaid incentive fees, but the district court did not make detailed factual findings on the issues that we consider dispositive on the underpayment claim.
 
 
 [11]
 DPA had been accepting a one percent commission since 1985, and a position based on limitations might have been pertinent in response to such claims.
 
 
 [12]
 Nor, as DPA urges, does the Declaratory Judgment Act, 28 U.S.C. 2201 et seq., remedy the lack of pretrial notice here. The Act requires that any further relief be awarded following notice and a hearing. 28 U.S.C. 2202. See also B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1428 (Fed. Cir. 1997); Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co., 966 F.2d 847, 852-53 (4th Cir. 1992).
 
 
 [13]
 DPA argues that we should decline to review SIADS's challenge to its liability for the Harowe Products commissions because SIADS raises the issue that the Harowe Products were only commissionable at one percent for the first time on appeal. We reject this argument. SIADS's contention is more accurately characterized that notice and proof of its liability for two percent incentive fees on the Harowe Products was inadequate, and it properly raised this claim to the district court.
 
 
 [14]
 The district court stated:
 The Agreement, as amended, provides the Agreement shall be construed and governed by English law. Notwithstanding this Agreement, the parties have referred the Court only to Washington law. The Court, sitting in diversity, must apply the law of the forum. Washington conflict of laws rules require the Court to apply Washington substantive law unless there is a conflict in the law which is presented to the Court. Smiths has failed to show that a conflict exists between English and Washington law. In fact, Smiths relied exclusively on Washington law in its summary judgment brief, docket no. 47, because "it does not appear that the law of Washington is materially different from English law on these issues." As a result, the Court will presume that Washington law is not in conflict with English law, and will apply Washington law.
 (internal citations omitted).
 
 
 [15]
 We cannot discern with certainty whether the district court's rejection of the application of English law to prejudgment interest was based on procedural or substantive grounds. From review of the record, we surmise the district court's decision was based on the late notice asserting application of English law and a procedural failure. Certainly, nothing in the record suggests that the district court rejected English law for prejudgment interest on a substantive ground. In any event, in reviewing decisions of the district court we may affirm on any ground supported by the record. Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc., 180 F.3d 1072, 1077 n. 3 (9th Cir. 1999). We focus on the procedural issue posed by Rule 44.1 and assess whether there was an abuse of discretion.
 
 
 [16]
 The full text of the rule is:
 Rule 44.1. Determination of Foreign Law
 A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.
 
 
 [17]
 In the pretrial order, SIADS did not allege that English law governed prejudgment interest. The pretrial order states, consistent with Federal Rule of Civil Procedure 16(e), that the "order shall control the subsequent course of the action unless modified by a subsequent order." The Local Rules for the Western District of Washington state that "the provisions of this rule [Rule 16] will be strictly enforced. "Although Rule 16(e) allows for the modification of the pretrial order "to prevent manifest injustice," at no time did SIADS request such a modification. If the notice that SIADS gave urging English law for prejudgment interest were considered reasonable, then it would be necessary to assess whether contentions on prejudgment interest would be required to be included in the pretrial order and, if so, whether modification of the order would be permitted to "prevent manifest injustice." However, if reasonable notice under Rule 44.1 was not given, then the issue of scope and possible amendment of the pretrial order need not be reached.
 
 
 [18]
 Other courts have declined to consider foreign law because it was raised late in the district court's proceedings absent extenuating circumstances. See, e.g., Whirlpool Fin. Corp. v. Sevaux, 96 F.3d 216, 221 (7th Cir. 1996) (holding that under Rule 44.1's notice requirement a party waived its appeal to foreign law when he failed to argue Venezuelan law until after summary judgment had been rendered against him, and the district court had relied on Illinois law); Am. Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 540 n. 14 (5th Cir. 1987) (citing Rule 44.1 and stating that "the applicability of a foreign country's law should be raised by reasonable notice before trial"); Shonac Corp. v. AMKO Int'l, Inc., 763 F. Supp. 919, 940 n. 2 (S.D. Ohio 1991) (declining to consider plaintiff's submission one day before summary judgment was announced of English translation of Korean law when plaintiff failed to mention applicability of law in its complaint, memorandum, or argument).
 
 
 [19]
 As indicated above, Rule 44.1 expressly provides that "the court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1.
 
 
 [20]
 See Thyssen Steel Co. v. M/V Kavo Yerakas, 911 F. Supp. 263, 267 n. 5 (S.D. Tex. 1996) (declining to find notice reasonable, and explaining: "The plaintiffs contend that they did not proffer notice sooner because the possible applicability of Belgium law did not come into focus until after the court of appeals ruled. This fact alone would not excuse the plaintiffs from Rule 44.1's requirements. The issue is not whether the applicability of foreign law only came into focus on remand. The issue is whether the plaintiffs would have been reasonably expected to raise the foreign law issue sooner.")
 
 
 [21]
 Even if reviewed de novo rather than for abuse of discretion, we would hold that notice of foreign law as applied to prejudgment interest was not reasonable here and did not satisfy Rule 44.1.