# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 7, 2005

Decided  July 15, 2005
Reissued July 18, 2005

No. 04-5393

SALIM AHMED HAMDAN,
APPELLEE

v.

DONALD H. RUMSFELD, UNITED STATES SECRETARY OF
DEFENSE, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(04cv01519)

———

*Peter D. Keisler*, Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants.  With him on the briefs were *Paul D. Clement*, Acting Solicitor General, *Gregory G. Katsas*, Deputy Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, *Douglas N. Letter, Robert M. Loeb, August Flentje, Sharon Swingle, Eric Miller* and *Stephan E. Oestreicher, Jr.*, Attorneys.

*Daniel J. Popeo* and *Richard A. Samp* were on the brief of *amici curiae* Washington Legal Foundation and Allied Educational Foundation in support of appellants.

*Jay Alan Sekulow* and *James M. Henderson, Jr.* were on the brief of *amicus curiae* The American Center for Law & Justice supporting appellants.

*Neal K. Katyal* and *Charles Swift*, pro hac vice, argued the cause for appellee. With them on the briefs were *Benjamin S. Sharp*, *Kelly A. Cameron*, *Harry H. Schneider, Jr.*, *Joseph M. McMillan*, *David R. East*, and *Charles C. Sipos.*

*Carlos M. Vazquez* and *David C. Vladeck* were on the brief of *amici curiae* of fifteen law professors in support of appellee.

*David R. Berz* was on the brief for *amici curiae* Louise Doswald-Beck, et al. in support of appellee.

*Jordan J. Paust* was on the brief for *amicus curiae* International Law and National Security Law Professors in support of appellee.

*Jenny S. Martinez*, appearing pro se, was on the brief for *amici curiae* Jenny S. Martinez and Allison Marston Danner.

*Mary J. Moltenbrey* was on the brief for *amici curiae* 305 United Kingdom and European Parliamentarians in support of appellee.

*Gary S. Thompson* was on the brief for *amici curiae* Eleven Legal Scholars in support of appellee.

*Philip Sundel*, Attorney, Office of Chief Defense Counsel, was on the brief for *amicus curiae* Military Attorneys Detailed to Represent Ali Hamza Ahmad Sulayman Al Bahlul in support of appellee.

*Kurt J. Hamrock* and *Phillip E. Carter* were on the brief for *amici curiae* Military Law Practitioners and Academicians Kevin J. Barry, et al. in support of appellee.

*Blair G. Brown* was on the brief for *amicus curiae* National Association of Criminal Defense Lawyers, Inc. in support of appellee.

*Elisa C. Massimino* was on the brief for *amici curiae* Human Rights First, et al. in support of appellee.

*David H. Remes* was on the brief for *amici curiae* General Merrill A. McPeak, et al. in support of appellee.

*Jonathan M. Freiman* was on the brief for *amici curiae* People for the American Way Foundation, et al. in support of appellee.

*Morton Sklar* was on the brief for *amicus curiae* The World Organization for Human Rights USA in support of appellee.

*Jonathan L. Hafetz* was on the brief for *amicus curiae* Louis Fisher in support of appellee.

*Alan I. Horowitz* was on the brief for *amicus curiae* Noah Feldman in support of appellee.

*Christopher J. Wright* and *Timothy J. Simeone* were on the brief for *amicus curiae* Urban Morgan Institute for Human Rights in support of appellee.

*James J. Benjamin, Jr.*, *Nancy Chung*, *Amit Kurlekar*, Steven M. Pesner, and Laura K. Soong were on the brief for *amicus curiae* The Association of the Bar of the City of New York in support of appellee.

Before: RANDOLPH and ROBERTS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

RANDOLPH, *Circuit Judge*: Afghani militia forces captured Salim Ahmed Hamdan in Afghanistan in late November 2001. Hamdan's captors turned him over to the American military, which transported him to the Guantanamo Bay Naval Base in Cuba. The military initially kept him in the general detention facility, known as Camp Delta. On July 3, 2003, the President determined "that there is reason to believe that [Hamdan] was a member of al Qaeda or was otherwise involved in terrorism directed against the United States." This finding brought Hamdan within the compass of the President's November 13, 2001, Order concerning the Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833. Accordingly, Hamdan was designated for trial before a military commission.

In December 2003, Hamdan was removed from the general population at Guantanamo and placed in solitary confinement in Camp Echo. That same month, he was appointed counsel, initially for the limited purpose of plea negotiation. In April 2004, Hamdan filed this petition for habeas corpus. While his petition was pending before the district court, the government formally charged Hamdan with conspiracy to commit attacks on civilians and civilian objects, murder and destruction of property by an unprivileged belligerent, and terrorism. The charges alleged that Hamdan was Osama bin Laden's personal driver in Afghanistan between 1996 and November 2001, an allegation Hamdan admitted in an affidavit. The charges further alleged

that Hamdan served as bin Laden's personal bodyguard, delivered weapons to al Qaeda members, drove bin Laden to al Qaeda training camps and safe havens in Afghanistan, and trained at the al Qaeda-sponsored al Farouq camp. Hamdan's trial was to be before a military commission, which the government tells us now consists of three officers of the rank of colonel. Brief for Appellants at 7.

In response to the Supreme Court's decision in *Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004), Hamdan received a formal hearing before a Combatant Status Review Tribunal. The Tribunal affirmed his status as an enemy combatant, "either a member of or affiliated with Al Qaeda," for whom continued detention was required.

On November 8, 2004, the district court granted in part Hamdan's petition. Among other things, the court held that Hamdan could not be tried by a military commission unless a competent tribunal determined that he was not a prisoner of war under the 1949 Geneva Convention governing the treatment of prisoners. The court therefore enjoined the Secretary of Defense from conducting any further military commission proceedings against Hamdan. This appeal followed.

I.

The government's initial argument is that the district court should have abstained from exercising jurisdiction over Hamdan's habeas corpus petition. *Ex parte Quirin*, 317 U.S. 1 (1942), in which captured German saboteurs challenged the lawfulness of the military commission before which they were to be tried, provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions. The Supreme Court ruled against the petitioners in *Quirin*, but only after

considering their arguments on the merits. In an effort to minimize the precedential effect of *Quirin*, the government points out that the decision predates the comity-based abstention doctrine recognized in *Schlesinger v. Councilman*, 420 U.S. 738 (1975), and applied by this court in *New v. Cohen*, 129 F.3d 639 (D.C. Cir. 1997). *Councilman* and *New* hold only that civilian courts should not interfere with ongoing court-martial proceedings against citizen servicemen. The cases have little to tell us about the proceedings of military commissions against alien prisoners. The serviceman in *Councilman* wanted to block his court-martial for using and selling marijuana; the serviceman in *New* wanted to stop his court-martial for refusing to obey orders. The rationale of both cases was that a battle-ready military must be able to enforce "a respect for duty and discipline without counterpart in civilian life," *Councilman*, 420 U.S. at 757, and that "comity aids the military judiciary in its task of maintaining order and discipline in the armed services," *New*, 129 F.3d at 643. These concerns do not exist in Hamdan's case and we are thus left with nothing to detract from *Quirin*'s precedential value.

Even within the framework of *Councilman* and *New*, there is an exception to abstention: "a person need not exhaust remedies in a military tribunal if the military court has no jurisdiction over him." *New*, 129 F.3d at 644. The theory is that setting aside the judgment after trial and conviction insufficiently redresses the defendant's right not to be tried by a tribunal that has no jurisdiction. *See Abney v. United States*, 431 U.S. 651, 662 (1977). The courts in *Councilman* and *New* did not apply this exception because the servicemen had not "raised *substantial* arguments denying the right of the military to try them at all." *New*, 129 F.3d at 644 (citing *Councilman*, 420 U.S. at 759). Hamdan's jurisdictional challenge, by contrast, is not insubstantial, as our later discussion should demonstrate. While he does not deny the military's authority to

try him, he does contend that a military commission has no jurisdiction over him and that any trial must be by court-martial. His claim, therefore, falls within the exception to *Councilman* and, in any event, is firmly supported by the Supreme Court's disposition of *Quirin*.

II.

In an argument distinct from his claims about the Geneva Convention, which we will discuss next, Hamdan maintains that the President violated the separation of powers inherent in the Constitution when he established military commissions.   The argument is that Article I, § 8, of the Constitution gives Congress the power "to constitute Tribunals inferior to the supreme Court," that Congress has not established military commissions, and that the President has no inherent authority to do so under Article II. *See* Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt:  Trying the Military Tribunals*, 111 YALE L.J. 1259, 1284-85 (2002).

There is doubt that this separation-of-powers claim properly may serve as a basis for a court order halting a trial before a military commission, *see United States v. Cisneros*, 169 F.3d 763, 768-69 (D.C. Cir. 1999), and there is doubt that someone in Hamdan's position is entitled to assert such a constitutional claim, *see People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).  In any event, on the merits there is little to Hamdan's argument.

The President's Military Order of November 13, 2001, stated that any person subject to the order, including members of al Qaeda, "shall, when tried, be tried by a military commission for any and all offenses triable by [a] military commission that such individual is alleged to have

committed . . .." 66 Fed. Reg. at 57,834. The President relied on four sources of authority: his authority as Commander in Chief of the Armed Forces, U.S. CONST., art. II, § 2; Congress's joint resolution authorizing the use of force; 10 U.S.C. § 821; and 10 U.S.C. § 836. The last three are, of course, actions of Congress.

In the joint resolution, passed in response to the attacks of September 11, 2001, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided" the attacks and recognized the President's "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224, 224 (2001). *In re Yamashita*, 327 U.S. 1 (1946), which dealt with the validity of a military commission, held that an "important incident to the conduct of war is the adoption of measures by the military commander, not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who, in their attempt to thwart or impede our military effort, have violated the law of war." *Id.* at 11. "The trial and punishment of enemy combatants," the Court further held, is thus part of the "conduct of war." *Id.* We think it no answer to say, as Hamdan does, that this case is different because Congress did not formally declare war. It has been suggested that only wars between sovereign nations would qualify for such a declaration. *See* John M. Bickers, *Military Commissions are Constitutionally Sound: A Response to Professors Katyal and Tribe*, 34 TEX. TECH. L. REV. 899, 918 (2003). Even so, the joint resolution "went as far toward a declaration of war as it might, and as far or further than Congress went in the Civil War, the Philippine Insurrection, the Boxer Rebellion, the Punitive Expedition against Pancho Villa, the Korean War, the Vietnam War, the invasion of Panama, the

Gulf War, and numerous other conflicts." *Id.* at 917. The plurality in *Hamdi v. Rumsfeld*, in suggesting that a military commission could determine whether an American citizen was an enemy combatant in the current conflict, drew no distinction of the sort Hamdan urges upon us. 124 S. Ct. at 2640-42.

*Ex parte Quirin* also stands solidly against Hamdan's argument. The Court held that Congress had authorized military commissions through Article 15 of the Articles of War. 317 U.S. at 28-29; *accord In re Yamashita*, 327 U.S. at 19-20. The modern version of Article 15 is 10 U.S.C. § 821, which the President invoked when he issued his military order. Section 821 states that court-martial jurisdiction does not "deprive military commissions . . . of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions." Congress also authorized the President, in another provision the military order cited, to establish procedures for military commissions. 10 U.S.C. § 836(a). Given these provisions and *Quirin* and *Yamashita*, it is impossible to see any basis for Hamdan's claim that Congress has not authorized military commissions. *See* Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 HARV. L. REV. 2048, 2129-31 (2005). He attempts to distinguish *Quirin* and *Yamashita* on the ground that the military commissions there were in "war zones" while Guantanamo is far removed from the battlefield. We are left to wonder why this should matter and, in any event, the distinction does not hold: the military commission in *Quirin* sat in Washington, D.C., in the Department of Justice building; the military commission in *Yamashita* sat in the Phillipines after Japan had surrendered.

We therefore hold that through the joint resolution and the two statutes just mentioned, Congress authorized the military commission that will try Hamdan.

10

III.

This brings us to Hamdan's argument, accepted by the district court, that the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 ("1949 Geneva Convention"), ratified in 1955, may be enforced in federal court.

"Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. CONST., art. VI, cl. 2. Even so, this country has traditionally negotiated treaties with the understanding that they do not create judicially enforceable individual rights. *See Holmes v. Laird*, 459 F.2d 1211, 1220, 1222 (D.C. Cir. 1972); *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980). As a general matter, a "treaty is primarily a compact between independent nations," and "depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it." *Head Money Cases*, 112 U.S. 580, 598 (1884). If a treaty is violated, this "becomes the subject of international negotiations and reclamation," not the subject of a lawsuit. *Id.*; *see Charlton v. Kelly*, 229 U.S. 447, 474 (1913); *Whitney v. Robertson*, 124 U.S. 190, 194-95 (1888); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 306, 314 (1829), *overruled on other grounds, United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1883).

Thus, "[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 907 cmt. a, at 395 (1987). The district court nevertheless concluded that the 1949 Geneva Convention conferred individual rights enforceable in federal court. We believe the court's conclusion disregards the principles just

mentioned and is contrary to the Convention itself. To explain why, we must consider the Supreme Court's treatment of the Geneva Convention of 1929 in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and this court's decision in *Holmes v. Laird*, neither of which the district court mentioned.

In *Eisentrager*, German nationals, convicted by a military commission in China of violating the laws of war and imprisoned in Germany, sought writs of habeas corpus in federal district court on the ground that the military commission violated their rights under the Constitution and their rights under the 1929 Geneva Convention. 339 U.S. at 767. The Supreme Court, speaking through Justice Jackson, wrote in an alternative holding that the Convention was not judicially enforceable: the Convention specifies rights of prisoners of war, but "responsibility for observance and enforcement of these rights is upon political and military authorities." *Id.* at 789 n.14. We relied on this holding in *Holmes v. Laird*, 459 F.2d at 1222, to deny enforcement of the individual rights provisions contained in the NATO Status of Forces Agreement, an international treaty.

This aspect of *Eisentrager* is still good law and demands our adherence. *Rasul v. Bush*, 124 S. Ct. 2686 (2004), decided a different and "narrow" question: whether federal courts had jurisdiction under 28 U.S.C. § 2241 "to consider challenges to the legality of the detention of foreign nationals" at Guantanamo Bay. *Id.* at 2690. The Court's decision in *Rasul* had nothing to say about enforcing any Geneva Convention. Its holding that federal courts had habeas corpus jurisdiction had no effect on *Eisentrager*'s interpretation of the 1929 Geneva Convention. That interpretation, we believe, leads to the conclusion that the 1949 Geneva Convention cannot be judicially enforced.

Although the government relied heavily on *Eisentrager* in making its argument to this effect, Hamdan chose to ignore the decision in his brief. Nevertheless, we have compared the 1949 Convention to the 1929 Convention. There are differences, but none of them renders *Eisentrager*'s conclusion about the 1929 Convention inapplicable to the 1949 Convention. Common Article 1 of the 1949 Convention states that parties to the Convention "undertake to respect and to ensure respect for the present Convention in all circumstances." The comparable provision in the 1929 version stated that the "Convention shall be respected . . . in all circumstances." Geneva Convention of 1929, art. 82. The revision imposed upon signatory nations the duty not only of complying themselves but also of making sure other signatories complied. Nothing in the revision altered the method by which a nation would enforce compliance. Article 8 of the 1949 Convention states that its provisions are to be "applied with the cooperation and under the scrutiny of the Protecting Powers . . .." This too was a feature of the 1929 Convention. *See* Geneva Convention of 1929, art. 86. But Article 11 of the 1949 Convention increased the role of the protecting power, typically the International Red Cross, when disputes arose: "[I]n cases of disagreement between the Parties to the conflict as to the application or interpretation of the provisions of the present Convention, the Protecting Powers shall lend their good offices with a view to settling the disagreement." Here again there is no suggestion of judicial enforcement. The same is true with respect to the other method set forth in the 1949 Convention for settling disagreements. Article 132 provides that "at the request of a Party to the conflict, an enquiry shall be instituted, in a manner to be decided between the interested Parties, concerning any alleged violation of the Convention." If no agreement is reached about the procedure for the "enquiry," Article 132 further provides that "the Parties should agree on the choice of an umpire who will decide upon the procedure to be followed."

Hamdan points out that the 1949 Geneva Convention protects individual rights. But so did the 1929 Geneva Convention, as the Court recognized in *Eisentrager*, 339 U.S. at 789-90. The NATO Status of Forces Agreement, at issue in *Holmes v. Laird*, also protected individual rights, but we held that the treaty was not judicially enforceable. 459 F.2d at 1222.

*Eisentrager* also answers Hamdan's argument that the habeas corpus statute, 28 U.S.C § 2241, permits courts to enforce the "treaty-based individual rights" set forth in the Geneva Convention. The 1929 Convention specified individual rights but as we have discussed, the Supreme Court ruled that these rights were to be enforced by means other than the writ of habeas corpus. The Supreme Court's *Rasul* decision did give district courts jurisdiction over habeas corpus petitions filed on behalf of Guantanamo detainees such as Hamdan. But *Rasul* did not render the Geneva Convention judicially enforceable. That a court has jurisdiction over a claim does not mean the claim is valid. *See Bell v. Hood*, 327 U.S. 678, 682-83 (1946). The availability of habeas may obviate a petitioner's need to rely on a private right of action, *see Wang v. Ashcroft*, 320 F.3d 130, 140-41 & n.16 (2d Cir. 2003), but it does not render a treaty judicially enforceable.

We therefore hold that the 1949 Geneva Convention does not confer upon Hamdan a right to enforce its provisions in court. *See Huynh Thi Anh v. Levi*, 586 F.2d 625, 629 (6th Cir. 1978).

## IV.

Even if the 1949 Geneva Convention could be enforced in court, this would not assist Hamdan. He contends that a military commission trial would violate his rights under Article 102, which provides that a "prisoner of war can be validly sentenced

only if the sentence has been pronounced by the same courts according to the same procedure as in the case of members of the armed forces of the Detaining Power." One problem for Hamdan is that he does not fit the Article 4 definition of a "prisoner of war" entitled to the protection of the Convention. He does not purport to be a member of a group who displayed "a fixed distinctive sign recognizable at a distance" and who conducted "their operations in accordance with the laws and customs of war." *See* 1949 Convention, arts. 4A(2)(b), (c) & (d). If Hamdan were to claim prisoner of war status under Article 4A(4) as a person who accompanied "the armed forces without actually being [a] member[] thereof," he might raise that claim before the military commission under Army Regulation 190-8. *See* Section VII of this opinion, *infra*. (We note that Hamdan has not specifically made such a claim before this court.)

Another problem for Hamdan is that the 1949 Convention does not apply to al Qaeda and its members. The Convention appears to contemplate only two types of armed conflicts. The first is an international conflict. Under Common Article 2, the provisions of the Convention apply to "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." Needless to say, al Qaeda is not a state and it was not a "High Contracting Party." There is an exception, set forth in the last paragraph of Common Article 2, when one of the "Powers" in a conflict is not a signatory but the other is. Then the signatory nation is bound to adhere to the Convention so long as the opposing Power "accepts and applies the provisions thereof." Even if al Qaeda could be considered a Power, which we doubt, no one claims that al Qaeda has accepted and applied the provisions of the Convention.

The second type of conflict, covered by Common Article 3, is a civil war -- that is, an "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties . . .." In that situation, Common Article 3 prohibits "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by a civilized people." Hamdan assumes that if Common Article 3 applies, a military commission could not try him. We will make the same assumption *arguendo*, which leaves the question whether Common Article 3 applies. Afghanistan is a "High Contracting Party." Hamdan was captured during hostilities there. But is the war against terrorism in general and the war against al Qaeda in particular, an "armed conflict not of an international character"? *See* INT'L COMM. RED CROSS, COMMENTARY: III GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS OF WAR 37 (1960) (Common Article 3 applies only to armed conflicts confined to "a single country"). President Bush determined, in a memorandum to the Vice President and others on February 7, 2002, that it did not fit that description because the conflict was "international in scope." The district court disagreed with the President's view of Common Article 3, apparently because the court thought we were not engaged in a separate conflict with al Qaeda, distinct from the conflict with the Taliban. *Hamdan v. Rumsfeld,* 344 F. Supp. 2d 152, 161 (D.D.C. 2004). We have difficulty understanding the court's rationale. Hamdan was captured in Afghanistan in November 2001, but the conflict with al Qaeda arose before then, in other regions, including this country on September 11, 2001. Under the Constitution, the President "has a degree of independent authority to act" in foreign affairs, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003), and, for this reason and others, his construction and application of treaty provisions is entitled to "great weight." *United States v. Stuart*, 489 U.S. 353, 369

(1989); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). While the district court determined that the actions in Afghanistan constituted a single conflict, the President's decision to treat our conflict with the Taliban separately from our conflict with al Qaeda is the sort of political-military decision constitutionally committed to him. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). To the extent there is ambiguity about the meaning of Common Article 3 as applied to al Qaeda and its members, the President's reasonable view of the provision must therefore prevail.

## V.

Suppose we are mistaken about Common Article 3. Suppose it does cover Hamdan. Even then we would abstain from testing the military commission against the requirement in Common Article 3(1)(d) that sentences must be pronounced "by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See Councilman*, 420 U.S. at 759; *New*, 129 F.3d at 644; *supra* Part I. Unlike his arguments that the military commission lacked jurisdiction, his argument here is that the commission's procedures -- particularly its alleged failure to require his presence at all stages of the proceedings -- fall short of what Common Article 3 requires. The issue thus raised is not *whether* the commission may try him, but rather *how* the commission may try him. That is by no stretch a jurisdictional argument. No one would say that a criminal defendant's contention that a district court will not allow him to confront the witnesses against him raises a jurisdictional objection. Hamdan's claim therefore falls outside the recognized exception to the *Councilman* doctrine. Accordingly, comity would dictate that we defer to the ongoing military proceedings. If Hamdan were convicted, and if Common Article 3 covered him, he could contest his

conviction in federal court after he exhausted his military remedies.

## VI.

After determining that the 1949 Geneva Convention provided Hamdan a basis for judicial relief, the district court went on to consider the legitimacy of a military commission in the event Hamdan should eventually appear before one. In the district court's view, the principal constraint on the President's power to utilize such commissions is found in Article 36 of the Uniform Code of Military Justice, 10 U.S.C. § 836, which provides:

> Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals . . . may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, *but which may not be contrary to or inconsistent with this chapter*.

(Emphasis added.) The district court interpreted the final qualifying clause to mean that military commissions must comply in all respects with the requirements of the Uniform Code of Military Justice (UCMJ). This was an error.

Throughout its Articles, the UCMJ takes care to distinguish between "courts-martial" and "military commissions." *See, e.g.*, 10 U.S.C. § 821 (noting that "provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions . . . of concurrent jurisdiction"). The terms are not used interchangeably, and the majority of the

18

UCMJ's procedural requirements refer only to courts-martial. The district court's approach would obliterate this distinction. A far more sensible reading is that in establishing military commissions, the President may not adopt procedures that are "contrary to or inconsistent with" the UCMJ's provisions governing military commissions. In particular, Article 39 requires that sessions of a "trial by *court-martial* . . . shall be conducted in the presence of the accused." Hamdan's trial before a *military commission* does not violate Article 36 if it omits this procedural guarantee.

The Supreme Court's opinion in *Madsen v. Kinsella*, 343 U.S. 341 (1952), provides further support for this reading of the UCMJ. There, the Court spoke of the place of military commissions in our history, referring to them as "our commonlaw war courts. . . . Neither their procedure nor their jurisdiction has been prescribed by statute." *Id.* at 346-48. The Court issued its opinion two years after enactment of the UCMJ, and it is difficult, if not impossible, to square the Court's language in *Madsen* with the sweeping effect with which the district court would invest Article 36. The UCMJ thus imposes only minimal restrictions upon the form and function of military commissions, *see, e.g.*, 10 U.S.C. §§ 828, 847(a)(1), 849(d), and Hamdan does not allege that the regulations establishing the present commission violate any of the pertinent provisions.

VII.

Although we have considered all of Hamdan's remaining contentions, the only one requiring further discussion is his claim that even if the Geneva Convention is not judicially enforceable, Army Regulation 190-8 provides a basis for relief. This regulation, which contains many subsections, "implements international law, both customary and codified, relating to [enemy prisoners of war], [retained personnel], [civilian

internees], and [other detainees] which includes those persons held during military operations other than war." AR 190-8 § 1-1(b). The regulation lists the Geneva Convention among the "principal treaties relevant to this regulation." § 1-1(b)(3); *see Hamdi*, 124 S. Ct. at 2658 (Souter, J., concurring) (describing AR 190-8 as "implementing the Geneva Convention"). One subsection, § 1-5(a)(2), requires that prisoners receive the protections of the Convention "until some other legal status is determined by competent *authority*." (Emphasis added.) The President found that Hamdan was not a prisoner of war under the Convention. Nothing in the regulations, and nothing Hamdan argues, suggests that the President is not a "competent authority" for these purposes.

Hamdan claims that AR 190-8 entitles him to have a "competent tribunal" determine his status. But we believe the military commission is such a tribunal. The regulations specify that such a "competent tribunal" shall be composed of three commissioned officers, one of whom must be field-grade. AR 190-8 § 1.6(c). A field-grade officer is an officer above the rank of captain and below the rank of brigadier general -- a major, a lieutenant colonel, or a colonel. The President's order requires military commissions to be composed of between three and seven commissioned officers. 32 C.F.R. § 9.4(a)(2), (3). The commission before which Hamdan is to be tried consists of three colonels. Brief for Appellants at 7. We therefore see no reason why Hamdan could not assert his claim to prisoner of war status before the military commission at the time of his trial and thereby receive the judgment of a "competent tribunal" within the meaning of Army Regulation 190-8.

\* \* \*

For the reasons stated above, the judgment of the district court is reversed.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring: I concur in all aspects of the court's opinion except for the conclusion that Common Article 3 does not apply to the United States's conduct toward al Qaeda personnel captured in the conflict in Afghanistan. Maj. Op. 15-16. Because I agree that the Geneva Convention is not enforceable in courts of the United States, and that any claims under Common Article 3 should be deferred until proceedings against Hamdan are finished, I fully agree with the court's judgment.

\* \* \*

There is, I believe, a fundamental logic to the Convention's provisions on its application. Article 2 (¶ 1) covers armed conflicts between two or more contracting parties. Article 2 (¶ 3) makes clear that in a multi-party conflict, where any two or more signatories are on opposite sides, those parties "are bound by [the Convention] in their mutual relations"--but not (by implication) vis-à-vis any non-signatory. And as the court points out, Maj. Op. at 14, under Article 2 (¶ 3) even a non-signatory "Power" is entitled to the benefits of the Convention, as against a signatory adversary, if it "accepts and applies" its provisions.

Non-state actors cannot sign an international treaty. Nor is such an actor even a "Power" that would be eligible under Article 2 (¶ 3) to secure protection by complying with the Convention's requirements. Common Article 3 fills the gap, providing some minimal protection for such non-eligibles in an "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." The gap being filled is the non-eligible party's failure to be a nation. Thus the words "not of an international character" are sensibly understood to refer to a conflict between a signatory

nation and a non-state actor. The most obvious form of such a conflict is a civil war. But given the Convention's structure, the logical reading of "international character" is one that matches the basic derivation of the word "international," i.e., *between nations*. Thus, I think the context compels the view that a conflict between a signatory and a non-state actor is a conflict "not of an international character." In such a conflict, the signatory is bound to Common Article 3's modest requirements of "humane[]" treatment and "the judicial guarantees which are recognized as indispensable by civilized peoples."

I assume that our conflicts with the Taliban and al Qaeda are distinct, and I agree with the court that in reading the Convention we owe the President's construction "great weight." Maj. Op. at 15. But I believe the Convention's language and structure compel the view that Common Article 3 covers the conflict with al Qaeda.